30 So.2d 321

**THOMPSON et al. v. THOMPSON et al.**

**THOMPSON v. SAME.**

No. 38120.

Feb. 10, 1947.

Rehearing Denied March 17, 1947.

Dhu Thompson and Theus, Gresham, Davis & Leigh, all of Monroe, for intervenors-appellants.

Herold, Cousin & Herold, of Shreveport, for petitioner.

McCALEB, Justice.

The issues involved in the above captioned suits, which were consolidated for trial in the court below, arise out of the following facts which are not seriously disputed by the parties.

In 1916, Bartley G. Thompson and his wife, Margaret Thompson, together with their seven children moved from Franklin Parish to Richland Parish. In 1926, Bartley Thompson acquired by purchase a certain tract of land situated in Richland Parish, comprising approximately 100 acres, which became the family homestead and on which Thompson conducted farming operations.

On December 18, 1929, Bartley Thompson sold by authentic act the land with all of the improvements thereon to his only son, Jesse G. Thompson, for the recited consideration of $1500 cash. This act was duly recorded in the conveyance office of Richland Parish on the day of its passage. While the act, on its face, purported to be an act of sale it was, in reality, a donation in disguise as Jesse Thompson paid no consideration whatever for the transfer of the property and it was given to him on condition that he would not sell it during the life of either his father or his mother whom he agreed to support and maintain as long as they lived.

Simultaneously, with the delivery of the deed to Jesse Thompson, he executed a counter letter in favor of his father and mother which disclosed the true facts concerning the transfer. However, this counter letter was never recorded and it was subsequently destroyed by Jesse Thompson shortly after his father's death. Soon after Jesse Thompson obtained the deed from his father, he moved into one of the four dwelling houses situated on the land and conducted farming operations. His father and mother also lived on the place and earned enough for their frugal needs by raising chickens and crops.

Bartley Thompson died in 1932. After his death, Margaret Thompson, his widow, moved into the house occupied by Jesse Thompson and his wife. However, she was unable to get along with Jesse's wife and later moved to the residence of one of her married daughters, situated near the farm. Jesse Thompson thereafter lived

on the property with his wife and farmed the land until some time in the year 1942, when his wife left him. In November of 1943, Jesse, having obtained a war defense job in Bremerton, Washington, decided to rent the farm and, on November 17th, entered into a contract with one Arthur Thompson (unrelated by blood or marriage) wherein he leased the land, together with certain farm animals and machinery situated thereon, for the year 1944. The rental price agreed upon in this lease was five bales of cotton, averaging 500 pounds per bale, which Arthur Thompson agreed to deliver to Jesse on October 15th 1944.

In addition to providing for the lease of the property for the year 1944, the contract included an option clause reading as follows:

"First party, in consideration of the payment of the sum of $50.00 to him by second party, receipt of which is hereby acknowledged, gives and grants unto second party an option to purchase all of the above described property on or before December 31st 1944, on the following terms and conditions, to wit:

"Total purchase price, Sixty Five Hundred Dollars ($6500.00), to be paid $500.00 at time deed is passed, and ten notes of $600.00 each, due and payable annually one to ten years both inclusive, after date of deed, said notes to stipulate interest at the rate of 6% per annum from date until paid, said deed to be valid warranty deed, conveying the property clear and free of all encumbrances and to contain the usual security clauses.

"Second party agrees to notify first party by writing, deposited in the United States mail, properly addressed to second party, of his intention to exercise this option to purchase the property prior to December 1st, 1944.

"First party and second party agree that in the event the option is not exercised to purchase, rent as above provided for will be paid, and in the event the option to purchase is exercised by second party, the amount received from the sale of the five bales of cotton delivered to first party will be considered as a down payment on the property."

The contract of lease containing the above quoted option was duly recorded in the conveyance office of Richland Parish by Arthur Thompson on the date of its confection, to wit, November 17, 1943, and thereafter Arthur Thompson, as lessee, took possession of the land engaging in farming operations thereon.

During the early part of October 1944, Jesse Thompson returned to Richland Parish from Bremerton, Washington, for the purpose of collecting the rent due him which, according to the lease, was five bales of cotton. While in Richland Parish, he was a guest in the house of Arthur Thompson. At that time, discussion was had between Jesse and Arthur concerning

the latter's exercise of the option to purchase the property. There is much conflict in the evidence respecting the question as to whether there was a subsequent verbal agreement by which Arthur abandoned the option given him in the lease, as will hereinafter be pointed out. However, it is not disputed that Jesse mentioned something to Arthur about certain interests of his mother in the land and that, because of her claims, he could not deliver a good title to Arthur. But, be this as it may, the record shows that Arthur Thompson evinced an intention to exercise the option; that subsequently said option was actually exercised and that a tender was made to Jesse Thompson on December 13, 1944, in conformity with the contract.

During the period when the aforementioned discussions concerning the option were had, there was an "oil scare" in Richland Parish within the vicinity of the Thompson homestead and, as expressed in the brief of counsel for Arthur Thompson, "Thereafter, things began to develop fast and furiously." It appears that, on November 18, 1944, Arthur Thompson executed a mineral lease to the land in favor of one C. W. Sharp for a consideration of $3500 and, on the same day, sold to one F. B. King a one-half interest in and to all minerals which might be produced under the lease for $3,000. On December 5, 1944, Jesse Thompson executed a mineral lease in favor of C. V. Culver for a consideration of $100 and, on December

4, 1944, Mrs. Celia E. Thompson (Jesse's wife from whom he was separated) executed another mineral lease in favor of one Ross Walker in consideration of the sum of $5000.

With affairs in this state, the present litigation was instituted. On December 14th, Mrs. Margaret Thompson, surviving widow of Bartley Thompson, and her daughters, Mrs. Claudia Pitts, Mrs. Maudie Carpenter, Mrs. Annie Meredith, Mrs. Estha Posey and Mrs. Myrtie Stout, (five of the seven children of the marriage), filed suit in the District Court for Richland Parish alleging, in substance, that Bartley Thompson had died intestate in 1932; that Mrs. Margaret Thompson is the surviving widow in community and that the other plaintiffs are five of the seven legal heirs of the deceased; that Jesse Thompson, one of the defendants, is one of the other legal heirs and that Forney Hazel, a resident of the state of Washington and issue of the marriage between Treasy Thompson, deceased, and one Hazel, is the only other living legal heir of Bartley Thompson. They further averred that the hundred acres of land situated in Richland Parish belonged to the community of acquets and gains between Bartley and Margaret Thompson, which was the only property of which the community was possessed; that, whereas, it appeared that Bartley Thompson had sold the land in 1929 to his son, Jesse Thompson, in truth and in fact the sale was simulated as there was no consid-

eration given by Jesse Thompson for said transfer; that the transaction was furthermore a donation in disguise to the prejudice of the rights of the children of Bartley Thompson as his forced heirs and had the effect of depriving them of the legitimate portion reserved to them under the law and that, therefore, the pretended sale to Jesse Thompson was null and should be set aside and the property revendicated and brought back to his succession in order that his children could receive their legitimate portion.

It was further alleged that Jesse Thompson had leased the land to Arthur Thompson and had given the latter an option to purchase the property; that said option was wholly illegal; that, at the time it was executed, the said Jesse Thompson and Arthur Thompson had full knowledge of the true facts concerning the status of the property and that, despite this, they made the contract with the intention of depriving petitioners of their just rights and interest in said property through collusion and fraud.

They averred that, in a further attempt to defeat petitioners' rights and deprive them of the property, Arthur Thompson executed a purported oil and gas lease in favor of one C. W. Sharp and, at the same time, executed a purported sale of one-half of the minerals in and under said land to one F. B. King notwithstanding the fact that, at the time said lease was executed and said mineral interest sold, Arthur

Thompson had no deed to said land as was well known to him and the said C. W. Sharp and F. B. King.

Similar allegations were made with respect to the mineral lease given by Jesse Thompson to Culver and the lease executed by Celia Thompson, wife of Jesse Thompson, in favor of Ross Walker.

Plaintiffs accordingly prayed that the defendants, Jesse Thompson, Arthur Thompson, Mrs. Celia Thompson, C. W. Sharp, F. B. King, C. V. Culver and Ross Walker be cited and that, after due proceedings, there be judgment declaring the nullity of the purported deed from Bartley Thompson to Jesse Thompson; that they be recognized as the owners of the property in controversy in proportion of an undivided one-half interest to Mrs. Margaret Thompson and five-sevenths of an undivided one-half to the other plaintiffs; that the option to Arthur Thompson be annulled and that all mineral leases and sale of mineral rights made either by Arthur Thompson, Jesse Thompson or Mrs. Celia Thompson be declared to be without effect.

On the day that the foregoing suit was instituted, Arthur Thompson filed an action in the same court against Jesse Thompson for a specific performance of the contract to sell the hundred acre tract which he alleged had become executory at the time he exercised the option given him by Jesse Thompson in the lease contract of November 17, 1943. He averred, in substance, that he had complied with all of the provisions

contained in the contract and had made a tender to Jesse Thompson of the purchase price but that, despite this, the latter had wrongfully refused to carry out his obligation. He joined as party defendants to the suit Jesse, Thompson, C. V. Culver (to whom Jesse Thompson had granted a mineral lease) and Mrs. Celia Thompson, wife of Jesse Thompson, and prayed that the court enforce the option by decreeing him to be the owner of the land and that the court further decree that C. V. Culver and Mrs. Celia Thompson have no interest whatever in the property.

Mrs. Margaret Thompson and her daughters intervened in this suit, setting forth the same claims made by them in the action which they had instituted against Jesse Thompson and others.

In due course, Jesse Thompson filed his answer to the petition of his mother and sisters, in which he admitted all of the essential allegations therein respecting the fact that he had paid no consideration whatever to his father for the execution of the deed in his favor in the year 1929 and that he received the property with the understanding that it would not be alienated during the lifetime of his parents.

In the answer of Arthur Thompson, C. W. Sharp and F. B. King to the suit of Mrs. Margaret. Thompson and her daughters, the allegations of the petition were denied and it was set forth that Arthur Thompson acquired the option, which had been duly exercised, for valuable consideration and

on the faith of the public records, without any knowledge whatever of any secret equities which might have existed between Mrs. Thompson and her daughters and Jesse Thompson.

C. V. Culver, mineral lessee from Jesse Thompson, made a defendant in both suits, did not appear and has abandoned any right which he might have had under the lease. The same is true of Ross Walker, mineral lessee from Mrs. Celia Thompson.

The answer of Mrs. Celia Thompson, wife of Jesse Thompson, to the suit of Mrs. Margaret Thompson and her daughters is a denial of the allegations contained therein and she contends that the property in question became part of the community existing between Jesse Thompson and herself; that, on March 9, 1945, she obtained a divorce from Jesse Thompson and that she is entitled to recognition of an undivided one-half interest in said property.

In her answer to the suit of Arthur Thompson, Mrs. Celia Thompson averred that she had the right to interfere with the execution of the option insofar as it might adversely affect her interest in the property inasmuch as said property belonged to the community formerly existing between Jesse Thompson and herself. She prayed that the suit be dismissed at plaintiff's costs and, in the alternative, that her rights be reserved to proceed in an appropriate action to recover one-half of the proceeds of the sale in the event that

the court granted a specific performance to Arthur Thompson.

Jesse Thompson, in answer to the suit filed by Arthur Thompson for specific performance, admitted the execution of the option but denied that plaintiff was entitled to the relief prayed for for the reason that, in view of the claims of Mrs. Margaret Thompson and his sisters, he could not execute a valid title to the tract of land. Further answering he averred that, in any case, Arthur Thompson was not entitled to a specific performance of the contract for the reason that, on or about October 17, 1944, he and Arthur Thompson entered into a verbal agreement by which the option to purchase was vacated and cancelled and, in lieu thereof, a new contract and agreement was made by which Arthur Thompson was to pay $200 rent for the year 1944 and retain $300 to repair the property, instead of delivering to him $500 for the rental as provided in the original lease, and, that, further, Arthur Thompson was to lease the property for the year 1945 at a rental of $450.

Subsequent to the filing of all answers, the cases were consolidated for trial in the District Court by agreement of the parties. After a hearing, the judge dismissed the suit of Mrs. Margaret Thompson and her daughters as to all defendants without prejudice, however, to plaintiffs' rights to seek a personal judgment against Jesse Thompson.

In the action of Arthur Thompson against Jesse Thompson, the court held that the plaintiff was entitled to a specific performance of the contract dated November 17, 1943, and directed Jesse Thompson to sign an appropriate deed conveying the property to him. It was further ordered that there be judgment in favor of Arthur Thompson and against Mrs. Celia Thompson, wife of Jesse Thompson, decreeing her to be without interest in the property but reserving to her the right to proceed by an appropriate action to recover any interest she might have in the purchase price of the land. No mention is made in the judgment, respecting the intervention of Mrs. Margaret Thompson and her daughters, but its silence in this respect is equivalent to a dismissal of their claim.

Mrs. Margaret Thompson and her daughters have appealed from the judgment dismissing their suit and also from the dismissal of their intervention in the case brought by Arthur Thompson. Jesse Thompson has appealed from the judgment against him in the specific performance suit of Arthur Thompson. Celia Thompson, wife of Jesse Thompson, has not appealed, and, therefore, is not before us.

We first direct our attention to the only disputed question of fact in the case, that is, the contention of Jesse Thompson that, on or about October 17, 1944, it was verbally agreed between Arthur Thompson and himself that the option granted in the lease contract would be vacated

and annulled. Jesse Thompson says that this was brought about as a result of his information to Arthur Thompson that he, Jesse, could not execute a valid title to the property in view of the claims of his mother, Mrs. Margaret Thompson; that Arthur Thompson thereupon consented to the cancellation of the option; that, in consideration of this, he, Jesse, agreed that, instead of Arthur delivering to him the five bales of cotton stipulated as rent in the contract of lease, he would accept $200 and that Arthur would retain $300 in his hands to repair and recondition the structures situated on the premises. He further asserts that it was also verbally agreed that he would lease the premises to Arthur for the year 1945 as a farm for $450.

Arthur Thompson denies that this was the agreement between the parties. He declares that, in October of 1944, Jesse Thompson informed him for the first time that his mother had an interest in the property and that, therefore, he, Jesse, could not transfer a valid title; that he, Arthur, told Jesse that, if such were the case, he would not exercise the option although it was his desire to do so; that it was thereupon agreed that they should discuss the matter with Mr. Warren Hunt, a lawyer in Rayville, who had acted as attorney for both parties at the time the lease and option contract was made; that they repaired to Mr. Hunt's office where it was agreed that Mr. Hunt would make an abstract of the title of the land, the cost of which would be divided between Jesse and Arthur and that, if it appeared from the abstract that Mrs. Margaret Thompson had a recorded interest in the land, then the option would not be exercised but that, if said interest did not appear of record, then Jesse was to execute a deed to the property.

The testimony of Arthur Thompson is corroborated by his wife and Mr. Hunt. It is also supported by correspondence (letters and telegrams) exchanged between Jesse and Mr. Hunt after the former had returned from Richland Parish to Bremerton, Washington. The district judge decided this question of fact in favor of Arthur Thompson and we not only are unable to detect manifest error in his ruling but think that it is amply supported by the preponderance of evidence.

Hence, we approach a discussion of the important questions of law presented in this matter with the view that Arthur Thompson was not only without notice of any equities existing between the widow and heirs of Bartley Thompson and Jesse Thompson at the time he obtained the option, but also that, at the time he exercised his option, there was nothing of record to show that Mrs. Margaret Thompson or any of her other children had a legal right to set aside and annul the purported sale from Bartley Thompson to Jesse.

The action of Mrs. Margaret Thompson and her daughters, seeking to set aside the sale by Bartley Thompson to Jesse Thompson and to be declared the owners of the

property, even as against the rights acquired by Arthur Thompson and those holding under him, is founded primarily on three Articles of our Civil Code. Mrs. Margaret Thompson asserts that, insofar as her rights as surviving widow in community are concerned, the conveyance to Jesse Thompson is null for the reason that it was violative of Article 2404 of the Civil Code, the pertinent part of which reads as follows:

"He (the husband) can make no conveyance inter vivos, by a gratuitous title, of the immovables of the community, nor of the whole, or of a quota of the movables, unless it be for the establishment of the children of the marriage. * * *" (Words in parenthesis ours).

The daughters of Bartley Thompson declare that their right to set aside the conveyance to their brother is authorized by Articles 2239 and 1517 of the Civil Code. Article 2239 provides:

"Counter letters can have no effect against creditors or bona fide purchasers; they are valid as to all others; *but forced heirs shall have the same right to annul absolutely and by parol evidence the simulated contracts of those from whom they inherit, and shall not be restricted to the legitimate* (legitime)." (Italics and words in parenthesis ours.)

Article 1517, which deals with the right of reduction or revendication granted to forced heirs, reads:

"The action of reduction or revendication may be brought by the heirs *against third persons* holding the immovable property, which has been alienated by the donee, in the same manner and order that it may be brought against the donee himself, but after discussion of the property of the donee." (Italics ours.)

There can be no doubt, in view of the uncontested facts of this case as outlined above, that the purported sale from Bartley Thompson to Jesse Thompson was not only a sham and a simulation but that it was a donation in disguise which, if maintained, deprives the forced heirs of Bartley Thompson of the legitimate portion reserved to them by Articles 1493 and 1495 of our Civil Code. The transfer was also violative of Article 2404 of the Civil Code, insofar as Mrs. Margaret Thompson was concerned, and, therefore, subject to rescission on her complaint.

Counsel for Arthur Thompson and his transferees, Sharp and King, concede, as they must, that the deed by Bartley Thompson to his son was revocable as between the widow and heirs of Bartley Thompson and Jesse Thompson but they proclaim that this right, possessed by the widow and heirs, is ineffective as to their clients who have acquired an interest in the real estate on the faith of the public records. And, citing the leading case of McDuffie v. Walker, 125 La. 152, 51 So. 100, and the unbroken line of jurisprudence following that

decision, they maintain that the right acquired by Arthur Thompson under his option to purchase contained in the lease of November 17, 1943, which has been exercised, cannot now be defeated by any unrecorded rights of which he was without knowledge.

On the other hand, it is the contention of counsel for Mrs. Thompson and her daughters that the Articles of the Code, on which he relies, protect the rights of his clients, even though their rights were not of record and despite the fact that a real right has been acquired by a third party who was without knowledge of the existence of his clients' rights at the time of the acquisition.

■ Insofar as the right of Mrs. Thompson (to set aside the transfer to Jesse Thompson on the ground that it was, in fact, a conveyance inter vivos by gratuitous title of the immovables of the community to her prejudice) is concerned, we think that it is subordinate to the subsequently acquired right of Arthur Thompson, as promisee under a contract to sell, since the right he has obtained was based on his faith in the public record which shows the transaction between Bartley and Jesse Thompson to be an outright sale for valuable consideration. The case of Mc-Duffie v. Walker, supra, and the long list of pronouncements cited in Chachere v. Superior Oil Co., 192 La. 193, 187 So. 321, afford conclusive authority for our opinion.

■ Counsel, however, argues that a different rule is applicable with respect to the rights vested in the daughters of Bartley Thompson to set aside, as forced heirs, the purported sale as simulated under Article 2239 of the Civil Code. It is claimed that the provision "but forced heirs shall have the same right to annul absolutely and by parol evidence the simulated contracts of those from whom they inherit, and shall not be restricted to the legitimate," which was added to Article 2239 by Act No. 5 of 1884, evinces an intention on the part of the Legislature to grant to the forced heirs an absolute right to annul the simulated contracts of their parents, even though the property has passed into the hands of a third person purchasing for value on the faith of public records.

We cannot agree that the amendment to Article 2239 partakes of the force that counsel ascribes to it. The reason for the passage of the amendment was found, in Cox v. Von Ahlefeldt, 50 La.Ann. 1266, 23 So. 959, to be due to the prior jurisprudence of this Court (See Rachal v. Rachal, 4 La.Ann. 500, and Croizet's Heirs v. Gaudet, 6 Mart., O.S., 524), wherein it had been held that, while the heir could assail the dispositions of property by the donor to whose succession he had been called, the action was sustainable only on the theory that the heir was a third person not bound by the donor's acts where the dispositions exceeded the disposable portion. In other

words, Act No. 5 of 1884 was enacted for the purpose of permitting forced heirs to attack simulated transactions of the person, from whom they inherited, absolutely and without restriction as to their legitime. Consequently, the amendment to Article 2239 cannot be viewed as a grant to forced heirs to proceed against or assail the title acquired by the donee's vendee who has purchased the property on the faith of the public records and without actual notice of the infirmities.

In the recent case of Chachere v. Superior Oil Co., supra, this Court was confronted with a claim by forced heirs seeking to set aside, as simulated, pretended sales of land made by their ancestor and the vendee in said sales had sold to defendant, a third person, who purchased on the faith of the public record. It was there decided that the doctrine of McDuffie v. Walker, supra, was applicable and that the forced heirs could not maintain their action against the good faith purchaser. The only distinction between that case and this one (which will be hereinafter fully discussed) is that, there, the third person had actually acquired a legal title to the property, whereas, here, Arthur Thompson is possessed merely with an executory contract to purchase the property which invests him with the right to sue Jesse Thompson for a specific performance.

But counsel for the forced heirs strongly maintains that the rule as to good faith purchasers is wholly without applica-tion to the right given his clients to have the conveyance from their father to Jesse Thompson declared to be a donation in disguise and have the property revendicated to the succession of their father under the provisions of Article 1517 of the Civil Code. The case of Cox v. Von Ahlefeldt, supra, is relied upon as complete authority for this proposition.

Article 1517 of the Civil Code grants to forced heirs, seeking protection of their legitime of which they have been deprived by donation of the person from whom they inherit, the right to have the property revendicated or brought back to the succession, even though it has been transferred by the donee to a third person. Tessier v. Roussel, 41 La.Ann. 474, 6 So. 542; Carroll v. Cockerham, 38 La.Ann. 813; Guidry v. Claire, 181 La. 895, 160 So. 622 and Derby v. DeSaix Corporation, 201 La. 1060, 10 So.2d 896.

Counsel for Arthur Thompson and his transferees do not deny the existence of the rights accorded to forced heirs by Article 1517 but they maintain that the Article is clearly inapplicable to a case such as this where the transfer by the parent to the donee is in the form of a sale of the property by authentic act and, therefore, insofar as third persons are concerned, appears on the public record as a valid sale and not a donation.

We think that this contention of counsel for Arthur Thompson is well founded, for,

whereas our system of law has protected the forced heirs against acts designed to deprive him of his legitimate portion, the rights granted to such forced heir cannot be extended so as to defeat the subsequently acquired rights of third persons who have bought the property on the faith of the public records and under the belief that their vendor acquired a valid title by purchase. In fine, considerations of public policy, respecting a stability of titles, makes it necessary that innocent third parties prevail over the forced heir even though it results in the denial of the heir's right which our law has so carefully guarded.

The contention of counsel for the forced heirs of Bartley Thompson that the case of Cox v. Von Ahlefeldt is authority to the contrary is not well founded. The Cox case came to this Court as the result of the dismissal of plaintiff's claim on an exception of no cause of action. In that matter, plaintiffs, collateral heirs of Susan Robinson, a granddaughter of Oliver Beirne, sued his testamentary heirs to establish their right to immovable property in Louisiana alleged to belong to Beirne at the date of his death. At his death, Beirne was survived by his daughter, Mrs. Von Ahlefeldt, the children of his predeceased daughter, Mrs. Miles and Susan Robinson the child of another predeceased daughter. By will, Beirne, after certain bequests, named the Miles children as residuary legatees. A few days after making the will, Beirne conveyed, by authentic act to Mrs. Von Ahle-

feldt, all of his immovable property in Louisiana for the stipulated price of $1,000,-000 for which Mrs. Von Ahlefeldt made ten promissory notes of $100,000 each, two of which were payable annually for five years. A year later, Beirne gave written instructions to his testamentary executors that they were to return these notes to Mrs. Von Ahlefeldt on the conveyance by her to the Miles children of all of the property. Later, Beirne acquired the Houmas Plantation, placing legal title thereto in Mrs. Von Ahlefeldt. After Beirne's death, Mrs. Von Ahlefeldt conveyed all of this property to the Miles children, consideration for which was stated to be the return to Mrs. Von Ahlefeldt of the ten notes and $300,000 in addition. It was alleged by plaintiffs that there was no consideration given by the Miles children for this transfer but that it really consisted of a $200,000 legacy owed to Mrs. Von Ahlefeldt by them as residuary legatees and $100,000 for the relinquishment by Mrs. Von Ahlefeldt of her right as a forced heir, which right greatly exceeded this amount in value. The Miles children subsequently conveyed the plantations to the Miles Planting Company and the city property, formerly owned by Beirne, to the Tulane Educational Fund.

The petition alleged that the sale from Beirne to Mrs. Von Ahlefeldt was a simulation, as was the placing of the title to the Houmas Plantation in her name, and that it was made by Beirne with the purpose of disguising his intention of leaving all of

his property to the Miles children. As to the conveyance by Mrs. Von Ahlefeldt to the Miles children, the petition alleged that this was simply transferring the property to them as residuary legatees and not as purchasers and, hence, it was a fraudulent conveyance which the Miles children admitted in their sale to the Miles Planting Company by describing the property as that inherited by them from their grandfather. The petition further charged that if, notwithstanding the allegation of simulation, these acts were deemed to be donations, embracing as they did all of the immovable property of the testator, then the donations were void since they were in excess of the disposable portion. It was further alleged that the Miles Planting Company was fully apprised that the conveyance embraced the legitime of Susan Robinson.

This Court, after due consideration of the allegations made in that case, came to the conclusion that the petition stated a cause of action. But this resolution by the Court was not founded on the idea that, if the Miles Planting Company had been a purchaser in good faith without notice, it would not have been protected as such despite the right granted to the forced heirs by Article 1517 of the Civil Code. This is made evident by the concluding language of the decision wherein it is stated:

"Mrs. Von Ahlefeldt, as the case is presented on the pleadings, acquired no title, and could convey none to the legitime of the grandchild. Nor, in our view, do the Miles Company, *acquiring with full knowledge, the petition charges, of the rights of the grandchild,* stand in any better position than their vendors." (Italics ours.)

True, there is strong language contained in the opinion in that case, to which we shall later refer, from which counsel for Bartley Thompson's heirs is bound to derive great comfort. But, as stated, the opinion does not go so far as to hold that third persons acquiring property on the faith of the public record can be called upon to revendicate the property because their grantor did not actually obtain a valid title as the purported sale to him was really a donation in disguise and subject to the action of revendication provided for in Article 1517 of the Civil Code.

Thus, we hold that, if Arthur Thompson had actually acquired title to the tract of land in controversy prior to the assertion by the forced heirs of their rights to have the land brought back to the succession of Bartley Thompson so that they could obtain their legitime portion, he, as a purchaser for valuable consideration on the faith of the public records, could defeat the rights of these claimants.[1] The difficulty, however,

---

[1] It is to be noted that this would be true in this case only because the deed from Bartley Thompson to Jesse Thompson does not show on its face that it is a conveyance by a father to his son. If it did, it would place third persons on notice that the deed was subject to attack by forced heirs and hence a third purchaser would take title subject to the rights of forced heirs. See Art. 2444 of the Civil Code.

that Arthur Thompson encounters in this case is that he has not acquired the land in question. He is merely the holder of an option to purchase which has been transformed into an executory contract to sell by virtue of his timely exercise of the option. Moresi v. Burleigh, 170 La. 270, 127 So. 624. How, then, does this affect the situation?

Article 2462 of the Civil Code provides in part:

"One may purchase the right, or option to accept or reject, within a stipulated time, an offer or promise to sell, after the purchase of such option, for any consideration therein stipulated, such offer, or promise cannot be withdrawn before the time agreed upon; *and should it be accepted within the time stipulated, the contract or agreement to sell, evidenced by such promise and acceptance, may be specifically enforced by either party."* (Italics ours).

It will be seen from the foregoing that, where an option has been exercised timely, a binding contract to sell ensues which invests in either party the right to demand a specific performance of the agreement. There can be no doubt, therefore, that, from the moment Arthur Thompson exercised the option in the instant case, he acquired the right to demand that Jesse Thompson deliver title to the real estate. But the question arises as to whether this right is absolute and whether a court of equity will grant relief where the rights of forced heirs have intervened. It is obvious that, since Jesse Thompson was and still is the record title owner of the land in question, the forced heirs of his father have the right, under Article 1517 of the Civil Code, to require him to revendicate and return the land, which was actually donated to him, to his father's succession in order that they may receive their legitimate portion. And, as aforesaid, Arthur Thompson also has the right to a specific performance against Jesse Thompson under Article 2462 of the Civil Code. Thus, we are confronted with a clash of rights and, therefore, must determine which is paramount.

Counsel for Arthur Thompson and his transferees declare that the solution to this question is not difficult because it is well settled that a promisee of a contract to sell acquires a real interest in the property, which interest is entitled to the same protection that is accorded a purchaser who has acquired a title. In support of this contention, the cases of Lehman v. Rice, 118 La. 975, 43 So. 639; Whited & Wheless v. Calhoun, 122 La. 100, 47 So. 415 and Kinberger v. Drouet, 149 La. 986, 90 So. 367, are cited. And we may add that our recent decision in Watson v. Bethany, 209 La. 989, 26 So.2d 12, is authority for the proposition.

All of the cases relied on declare that one, who obtains a promise to sell, is given full protection under the law of registry and, where he has recorded the executory

contract, his rights will not be defeated even though the owner of the property subsequently conveys it to a third person. Thus, in the recent case of Watson v. Bethany, where a husband, during the existence of the community, had granted an option to the plaintiff to purchase the homestead, which was duly recorded and was subsequently converted into a binding promise to sell by timely exercise of the same by plaintiff, it was held that the subsequent registry by the wife of the promisor of her declaration of homestead pursuant to Act No. 35 of the Extra Session of 1921 was ineffective as to the right acquired by plaintiff, resulting from his recordation and subsequent acceptance of the option, to demand a specific performance. The same result was reached in the other cited cases, where the promise to sell had been registered prior to the recordation of a subsequent sale made by the promisor to third parties.

It will be noted that the foregoing cases upheld the right of the promisee of a duly recorded sale contract as to all after acquired rights of third parties, who registered their claims subsequent to the registry of the promise. Therefore, it might be suggested that a distinction exists between such cases and those in which the rights sought to be enforced were acquired prior to the time the right of the promisee came into existence. In the instant case, the right of the forced heirs to have the sale to Jesse Thompson set aside as being

a simulation under Article 2239 of the Civil Code became executory at the date of Bartley Thompson's death in 1932. And, likewise, their right to have the land revendicated to the succession of Bartley Thompson came into existence at the same time. But, while these rights were in esse long prior to the time Arthur Thompson obtained an option to purchase the land from Jesse Thompson in 1943, they were secret rights of which the public was without knowledge until they were exercised through judicial process and the recordation of a lis pendens.

Albeit, the right of the forced heirs, particularly with respect to the cause of action given them by Article 2239 of the Civil Code to set aside as against Jesse Thompson the simulated contract of their father, may be said to be in the same category as the right of the wife in the case of Watson v. Bethany, supra, to designate the property therein involved as a family home. There, Mrs. Bethany possessed the right, prior to the granting of the option by her husband, to prevent the sale or mortgage of the homestead without her consent but the Court held that this right was not effective as to third persons until it had been declared by registry.

So we see that, with respect to the right of the forced heirs of Bartley Thompson in this case to have the sale by him to Jesse Thompson set aside as a simulation, that right, while it came into existence long before Jesse Thompson promised to

sell the land to Arthur Thompson, could not affect the subsequently acquired right of Arthur Thompson to a specific performance of the contract because Arthur Thompson was without knowledge of the right and there was nothing on the public record to advise him of its existence.

■ But we are not so sure that the same result can be reached with respect to the right of the forced heirs to have the property brought back into the succession of Bartley Thompson on the ground that the sale to Jesse Thompson is a donation in disguise. The action for the rescission of the act as a simulated contract under Article 2239 was merely a right, which could be asserted, and it did not vest in the forced heirs of Bartley Thompson any real right in and to the property conveyed, until it was exercised and recognized by judicial decree. But this is not true of the right of these heirs to compel restitution of the land by Jesse Thompson to the succession of their father so that they could receive their legitimate portion. On the contrary, the fact that the deed from Bartley Thompson to Jesse was a donation in disguise prevented title from vesting in Jesse Thompson and, upon the death of his father in 1932, the land was returned fictitiously by operation of law to his father's succession under Article 1505 of the Civil Code for the purpose of determining whether the donation made by his father exceeded the disposable portion of the estate. The nature of the forced

heir's right in the land, which has been donated in disguise to the prejudice of their legitime, was extensively discussed in the case of Cox v. Von Ahlefeldt, supra, where the court observed:

"It is manifest the action is entirely distinct from the revocatory action, i. e., that of creditors to avoid the fraudulent contracts of their debtors, so much discussed at the bar. The Code describes a suit of this character as that of revendication to obtain the legitime of the heir. Rev.Civ.Code art. 1517.

\* \* \* \* \* \*

."The legal questions are as to the effect on immovable property in Louisiana of Mr. Beirne's will in favor of the Miles children to the exclusion of his grandchild Susan Robinson; whether, under our law, such a conveyance as that by Mr. Beirne to Mrs. Von Ahlefeldt, accompanied with the direction to convey to the heirs named in the will, and that accomplished as he had directed, and all of this followed by the transfer by the Miles children to the Miles Planting Company, places the property beyond the demand for the legitime of the grandchild. \* \* \* A large part of the discussion has been devoted to the nature of forced heirship. *It has been insisted it creates no ownership, but gives only a right of action.* In support of this it is urged that any donation by the owner is valid in his life, and retains its force after his death, unless successfully assailed by his forced heirs. All this as to the

force of the donation is to be accepted, and results from the provisions of the Code. But, in our view, the character of the title of the forced heir to his legitime—i. e. that part of the property the owner leaving children cannot dispose of to their prejudice—*is to be determined not merely by the action the law gives the forced heir to recover the legitime, but by the provisions of the Code that confer the right the action enforces.* That children cannot be deprived by their parent of that portion of his estate the law 'reserves for them' *conveys the idea of ownership incident to the parent's death, and an ownership supported by the action the Code gives when that death occurs, to be exerted against the legatees or heirs of the testator as well as against the third persons, the donees of the testator, who may be in possession of the legitime.* Rev.Civ.Code, arts. 1493, 1495, 1517. As one of the commentators puts it, it is not the mere right of heirship by which the heir succeeds to the legitime, 'mais la sienne propre', and throughout the elaborate discussions of the French jurists 'la reserve' or legitime *is treated as accruing to the forced heir at the death of the parent as effectively as the death of the owner vests title to the property he leaves in his heirs generally.* The forced heir, too, consistently with his peculiar title, of far superior nature to that of the ordinary heir, takes the legitime without liability that attaches to the ordinary heir for the debts of the deceased; nor does

the legitime brought back to the succession by 'the effect of the revendication or reduction' become subject to those debts. 2 Troplong, p. 292, § 910 et seq.; 5 TouiIier, p. 112 et seq.; Code Nap., art. 921; Rev.Civ.Code, art. 1517. In the light of the Code itself, made clearer, if that were possible, by that shed by the French commentators, *it seems to us not at all in accord with the law to treat the legitime as vesting a mere right of action.* That action is simply the correlative, or 'la sanction de la reserve nait avec elle.' 2 Mourlon, p. 311.

"Nor do we think the argument for the defendants more successful in the effort to withdraw the title to the legitime from the operation of that principle of our law that makes the death of the owner vest all his rights in the heirs. Rev.Civ.Code arts. 940, 941, et seq. The application of this principle, 'Le mort saisit le vif,' is. made more distinct by the articles of the Code which deem the forced heir so completely seised of right of all the succession property as to require the legatees to demand of the forced heir the delivery of the legacies. Id. arts. 892, 893, et seq. It is contended the forced heir cannot be deemed seised of right of the legitime *when it is held by third persons, and an action is necessary for its recovery.* This argument is supposed to derive strength from the provisions of the Code that give to the donation exceeding the disposable portion full effect, unless set aside by the action of

the heirs. Hence, it is contended, the forced heir cannot be deemed seised— i. e., the owner—of that property actually in the hands of those holding under titles from the owner to whose succession the heir is called. It seems to us the argument loses its apparent force when it is considered that the axiom of our law 'Le mort saisit le vif,' supposes all property donated by the parent to the prejudice of the legitime to be returned to the succession of the deceased parent when he dies, so as to form part of the property he leaves. Id. art. 1505. *Thus the donee, when the donation exceeds the disposable portion, holds the legitime during the life of the donor by a title conveying no ownership in the ordinary sense, but by a tenure determinable by his death, when, by the operation of forced heirship, the property is brought back to his succession, and brought back freed from any of his debts, and with the restoration of fruits from the date specified in the Code, Id. art. 1515.* Hence all the French authorities treat the opening of the succession—i. e. the death of the deceased—as extending to and including the legitime; that is, by the death the legitime, though in the hands of the donee, or of others to whom it may have been conveyed by the owner, is brought back, and treated as part of the succession property. * * * *We think, therefore, the forced heir is seised of right of the legitime by the death of the parent, and the fact that the property composing the legi-*

*time is then in the hands of third persons is no obstacle to the vesting of the right of the forced heirs."* (Italics ours.) See 50 La.Ann. at pages 1270, 1271, 1272, and 1273, 23 So. at pages 961, 962.

 It is clear, from the foregoing quotation, that the death of Bartley Thompson vested in his forced heirs a greater right than merely a right of action to compel Jesse Thompson to return the land in question to the succession of their father so that they could recover their legitimate portion. Prior to the death of Bartley Thompson, Jesse Thompson, under the deed which was a donation in disguise, held the legitime during the life of the donor by a title which conveyed no ownership to him in the ordinary sense. Upon the death of his father, the property was brought back by operation of law to the succession and the forced heirs became owners of such an undivided interest in the land as was necessary to fulfill the legitime reserved to them. Hence, as long as the paper title to the property remains in Jesse Thompson, the ownership of the forced heirs, to the extent of their legitime, remains and, while their ownership might have been defeated by Jesse Thompson's conveyance of the property to a third person acting on the faith of the public records prior to the exertion by the forced heirs of their rights, Arthur Thompson cannot force, by action for specific performance, Jesse Thompson to convey the land free of the interests already vested in

the forced heirs to the extent of their legitime, where those forced heirs have come into court resisting the demand.

The right to a specific performance is not absolute. It is a right that will generally receive judicial approbation and enforcement where, as in contracts for the delivery of an immovable, the remedy at law for damages is inadequate and the promisor is legally able to comply with his engagement. But, where the rights of others have intervened and make a full compliance with the promise impossible, it is the duty of the court to deny the relief sought and relegate the plaintiff to an action for damages. This principle has many times been recognized by this Court in cases where the promisor could not deliver a valid title. See Walshe v. Endom, 124 La. 697, 50 So. 656; Long v. Chailan, 187 La. 507, 175 So. 42 and Baumann v. Michel, 190 La. 1, 181 So. 549.

Thus, in the instant case, where the forced heirs of Bartley Thompson have a real interest (although not of record) in and to the land donated in disguise by their parent to Jesse Thompson and are before the Court asserting that interest in an action against Jesse Thompson to return the land to their father's succession, the promisee, under an executory contract to sell, will not be entitled to a specific performance of his agreement as Jesse Thompson is unable to deliver a title to the land free of the interest of the forced heirs to the extent of their legitime.

Since the suit of Arthur Thompson for specific performance must fail, it follows that his grantees, Sharp and King, who acquired the mineral lease and mineral interest with knowledge of the fact that Arthur Thompson did not own the property and had only an executory contract to purchase, must also fail in their claims. And, since Jesse Thompson is not required to perform his contract with Arthur Thompson, his mother is entitled to have his gratuitous title, as donee, of the homestead set aside and annulled on her demand under Article 2404 of the Civil Code, insofar as it affects her interest in the community.

Therefore, for the reasons assigned the judgment appealed from in the suit entitled Mrs. Margaret Thompson et al. v. Jesse C. Thompson et al., No. 10,986 of the docket of the Fifth Judicial District Court for the Parish of Richland is avoided and reversed and it is now ordered that there be judgment in that matter in favor of plaintiffs and against the defendants, setting aside and annulling the deed from Bartley G. Thompson to Jesse Thompson dated December 18th 1929, insofar as said deed affects the community interest of Mrs. Margaret Thompson as surviving spouse of Bartley G. Thompson, to the following described property to wit:

"South half of northwest quarter of northwest quarter, and southwest quarter of northwest quarter and northwest quar-

ter of southwest quarter of Section 16, Township 17 North, range 9 East."

It is further decreed that the above described property belongs to the community heretofore existing between Bartley G. Thompson and Margaret Thompson; that the sale thereof to Jesse Thompson is a donation in disguise and that, therefore, it is ordered that the above described property be and it is returned and revendicated to the succession of Bartley G. Thompson so that his forced heirs may make claim for their legitimate portion of his estate in appropriate proceedings to be hereafter taken.

It is further ordered that the option to purchase the above described property by Arthur Thompson, dated November 17, 1943, be and it is annulled and that the recordation of the same in Notarial Book 98, page 561 of the Conveyance Office of Richland Parish, Louisiana be erased and cancelled.

It is further ordered that the mineral lease granted by Arthur Thompson to C. W. Sharp on November 18, 1944, on the above described property be and it is annulled and that the recordation thereof be cancelled and erased from the Conveyance Office of Richland Parish, Louisiana.

It is further ordered that the sale by Arthur Thompson, dated November 18, 1944, of a mineral interest in and to the above described property to F. B. King

be and it is annulled and that the recordation thereof be cancelled and erased from the records of the Conveyance Office of the Parish of Richland, Louisiana.

It is further ordered that the judgment appealed from in the suit entitled "Arthur Thompson v. Jesse Thompson et als.," No. 10,987 of the docket of the Fifth Judicial District Court for the Parish of Richland, be and it is reversed and it is now ordered that plaintiff's suit be dismissed, reserving to him, however, the right to proceed against the defendant, Jesse Thompson, in an action for damages for breach of contract.

All costs in the suit entitled "Mrs. Margaret Thompson et al. v. Jesse Thompson et al." No. 10,986 of the docket of the Fifth Judicial District Court for the Parish of Richland, Louisiana, are to be paid by Jesse Thompson. All costs in the suit entitled "Arthur Thompson v. Jesse Thompson et als.," No. 10987 of the docket of the Fifth Judicial District Court for the Parish of Richland, are to be paid by Arthur Thompson.

HAMITER, Justice (dissenting).

In the majority opinion it is said that "* * * if Arthur Thompson had actually acquired title to the tract of land in controversy prior to the assertion by the forced heirs of their rights to have the land brought back to the succession of Bartley [G.] Thompson so that they could

obtain their legitimate portion, he, as a purchaser for valuable consideration on the faith of the public records, could defeat the rights of these claimants." With this conclusion I thoroughly agree.

I find myself in disagreement with the majority holding, however, that Arthur Thompson's rights can not prevail over those of the forced heirs since he is merely the holder of an option to purchase, obtained and duly recorded prior to his having received either actual or constructive notice of any adverse claims, which has been transformed into an executory contract to sell by virtue of his timely exercise of the option. His rights under the exercised option are, I think, just as conclusive against the heirs as they would have been had he actually acquired title to the property.

When an option is accepted within the time stipulated, the resulting contract may be specifically enforced by either party thereto. Revised Civil Code, art. 2462; Moresi v. Burleigh, 170 La. 270, 127 So. 624. In so far as its registry operates to protect one purchasing real estate against the claims of others, a duly recorded option to purchase is as effective as an actual sale. Lehman v. Rice, 118 La. 975, 43 So. 639; Whited & Wheless v. Calhoun, 122 La. 100, 47 So. 415; Kinberger v. Drouet, 149 La. 986, 90 So. 367; Watson v. Bethany, 209 La. 989, 26 So.2d 12. An acceptance of an option within the period permitted, with respect to third persons, relates back to the time of recordation. Kinberger v. Drouet and Watson v. Bethany, both supra.

The distinction sought to be made in the majority opinion between a recorded option and a recorded deed (as they relate to forced heirs) very likely will be productive of anomalous situations. Suppose, in this case, that Jesse Thompson had sold the property outright to John Doe after having granted Arthur Thompson's recorded option, and the deed evidencing the sale had been recorded immediately upon its confection. As between Arthur Thompson and John Doe, under the registry laws of this state and in the absence of the claims of the forced heirs of Bartley G. Thompson, the rights of the former, on his exercising his option, unquestionably would prevail over those of the latter. But taking into consideration the claims of those forced heirs, who would be entitled to the property? Would John Doe be preferred because his rights prime those of the heirs, while Arthur Thompson's do not, even though Arthur Thompson's claim is superior to that of John Doe's in the absence of forced heirs? Or would the forced heirs be preferred because their rights prime those of Arthur Thompson and his in turn prime John Doe's even though John Doe's would outrank the heirs' rights had Jesse Thompson not granted the option to Arthur Thompson?

The majority holding herein, I think, does violence to our laws of registry respecting immovables.

I respectfully dissent.

On Application for a Rehearing.

PER CURIAM.

In an application for a rehearing, counsel for Arthur Thompson, F. B. King and C. W. Sharp complain that we erred, among other things, in relying upon certain reasoning contained in Cox v. Von Ahlefeldt, 50 La.Ann. 1266, 23 So. 959, as authority for the proposition that a forced heir, who has been deprived of his legitime by an excessive donation made by the person from whom he inherits, is vested with a greater right than a mere right of action for a revendication of the property donated to his prejudice. Counsel assert that the holding in Cox v. Von Ahlefeldt, supra, that the forced heir becomes vested with an ownership of an undivided interest in the estate to the extent of his legitime at the date of the donor's death, was overruled by the Court three years later when the case came back on an appeal from a decision on its merits. Cox v. Von Ahlefeldt, 105 La. 543, 30 So. 175.

A careful examination of the long opinions in the case reported in 105 La., extending from page 544 through page 589, 30 So. pages 175 through 219 (not including the space devoted to the dissenting opinions), does not sustain the contention of counsel that the Court retracted or disavowed the reasoning contained in its previous decision. It is proper to say that the Court limited or restricted the nature of the ownership of the forced heir in the effects of the succession so that his rights were subject to prescription.

When the matter was remanded to the lower court for trial on its merits, in compliance with the decision in 50 La.Ann., the defendants pleaded the prescription of five years provided by Article 3542 of the Civil Code. This plea was based on the theory that plaintiffs' action was in reality one for the reduction of an excessive donation. The plea was sustained. On their appeal to this Court, plaintiffs contended that, in view of the holding of the Court in 50 La.Ann. they, as heirs of Susan Robinson (who was a forced heir of Beirne), had obtained a vested ownership in the succession from the date of Beirne's death to the extent of Susan Robinson's legitime and that Article 3542 was inapplicable. They argued that it was not incumbent upon Susan Robinson, as a forced heir with seisin of her legitimate portion, to bring a suit to be restored to the legitime when ownership had already vested in her. Thus, the Court was confronted with a conflict between the provisions of Articles 940 et seq. and 1607 et seq., which deal with the ownership of the forced and other heirs from the moment of death, and Articles 1502, 1504 and 3542, which declare that the donation in excess of the disposable

　　　·　　　·　　　

portion is not null but only reducible and that the forced heir must bring his suit within five years. On the first hearing the Court decided, by a majority of three to two (Justices Watkins and Blanchard dissenting), that the plea of prescription was well founded except as to a minor heir, as to whom prescription did not run. On rehearing, the original decree was reinstated by a majority of three to one, Justice Watkins having died in the interim.

A reading of the original majority opinion in the case reveals that the author attempts to demonstrate that the Court, in 50 La.Ann., did not positively decide with respect to the vesting of ownership of the forced heir but left the matter open for future consideration. However, we are more concerned with the decision on rehearing wherein the final views of the Court are set forth. Justice Monroe, as organ of the Court on the rehearing, re-examined the entire case and discussed thoroughly the question which is pertinent to this matter. He pointed out the difference between our Code and the French law with respect to donations which exceed the disposable portion, viz., that, under the Code Napoleon, such donations were absolutely null, whereas, under Article 1502 of our Civil Code, it is specifically provided that donations exceeding the quantum which may be legally disposed of to the prejudice of forced heirs are not null but only reducible to that quantum. In view of the difference between the Codes, it was resolved that the ownership vesting in the forced heir of the succession effects in an amount necessary to satisfy his legitime was not full ownership but one of a qualified nature. The exact words used by the Court in its conclusion are as follows:

"Whatever, therefore, may be the views of the French writers as to the proper interpretation of the French Code, and however well founded, there can be no-doubt that the Civil Code of this state has been interpreted to mean *that the ownership and seisin of the forced heir is so far qualified* that the testamentary donee of an interest including or impinging upon his legitime may lawfully hold possession as owner *until such forced heir demands the reduction of the donation.*" (Italics ours). 30 So. 214.

It will be seen from the foregoing that the Court, far from overruling its previous decision in 50 La.Ann. respecting the vesting of an ownership in the forced heir of an amount necessary to satisfy his legitime from the moment of death, specifically recognizes such ownership and seisin. It, however, held that the ownership and seisin of such forced heir is of a qualified nature—qualified to the extent that the donee may lawfully hold possession until the forced heir demands the reduction of the donation. But, obviously, from the moment the forced heir demands a reduction of the donation, the possession of the donee

becomes unlawful unless the forced heir has lost his right to be restored to the legitime by the accrual of prescription.

In the instant case, since prescription has not been pleaded in the lower court or here, Jesse Thompson's possession of the property in controversy became unlawful from the moment the forced heirs demanded that the property be returned to their father's succession.

The other contentions made by counsel in their application have been fully disposed of by the original opinion.

The application for a rehearing is refused.

HAMITER, J., adheres to his dissent.

O'NIELL, C. J., dissents from the refusal to grant a rehearing.