(37 South. 38.)

No. 14,677.

## CHATTANOOGA CAR & FOUNDRY CO. v. LEFEBVRE.

(Feb. 29, 1904.)

CONTRACT — CONSTRUCTION — PERFORMANCE — DEFAULT—DAMAGES—DEFENSES — CONFLICTING EVIDENCE — ESTOPPEL — BURDEN OF PROOF.

1. Under the contract sued on the plaintiff agreed to ship to the defendant a certain number of cane cars "as early as possible in September," and it is shown that the plaintiff was informed that the cars were to be used in taking off the cane crop of that year. *Held*: A fair reading of the contract leads to the conclusion that the question, "How early in September was it possible for the plaintiff to ship the cars?" was for him to determine, and hence that he had until the expiration of the last day of that month within which to make the shipment; that the defendant was, therefore, in no position to put him in default prior to that time, and was under no obligation to do so afterwards, since the delay within which the shipment should have been made must then have expired, and the plaintiff could by no possibility thereafter have complied with his contract. *Held*, moreover, that the inability of the plaintiff, whether acknowledged then or afterwards, to make the shipment within the time specified, it being shown that such time was of the essence of the contract, rendered the putting in default unnecessary. *Held*, further, that the fact that the defendant accepted the cars and paid the freight on them does not preclude his recovery of the damages shown to have been sustained by reason of the failure of the plaintiff to ship them within the time agreed on, since he was then threatened with a loss, which it was at once his duty, his interest, and his right to minimize as far as possible, and his efforts in that direction ought not to be allowed to operate to his prejudice.

2. It is a matter of public and historical knowledge that sugar cane is an exotic in this state, and that a freeze at some time between the beginning and the end of the short grinding season is a danger by which each successive crop is threatened; and where, in order reasonably to provide against such danger, a planter contracts for the shipment to him, in September, of apparatus necessary to take off his crop, and the apparatus is not so shipped, and part of the crop is lost, the defense that the freeze came a few days earlier, and that the temperature fell a few degrees lower, than usual, is not entitled to consideration; since neither of those contingencies is beyond the range of possibility, or even of reasonable expectation.

3. A litigant cannot be heard to establish a fact for one purpose and deny it for another, and where he chooses to attempt the establishment of facts which are irreconcilable with each other he must abide by that which is least favorable to his case.

## On Rehearing.

4. The basis and measure of damages was the loss of cane which defendant met with because the cars were not delivered in time.

5. The violation was positive, and not passive. Default was not necessary.

6. Defendant, by receiving the property sold to him, forced so to do by the emergency of the occasion, is not debarred from claiming damages growing out of plaintiff's failure to comply with his contract.

7. Needful change is made in order to charge up amount allowed as damages and establish balance due to plaintiff.

8. The highest testimony—defendant's oath, and that of his engineer—leads to the inevitable conclusion that the damages cannot be increased; and the original judgment is reinstated as amended.

Provosty, J., dissenting.

(Syllabus by the Court.)

Appeal from Twenty-First Judicial District Court, Parish of West Baton Rouge; E. B. Talbot, Judge.

Action by the Chattanooga Car & Foundry Company against Victor M. Lefebvre. Judgment for defendant, and plaintiff appeals. Modified and affirmed.

William Elias Howell and Hébert & Hébert, for appellant. Louis Lozano and Thomas J. Kernan, for appellee.

## Statement of the Case.

MONROE, J. This is an action brought by Henry Clay Evans, doing business under the name of the Chattanooga Car & Foundry Company, for a balance alleged to be due for certain cane cars furnished to Victor M. Lefebvre under the following contract, to wit:

"Chattanooga, Tenn., July 6th, 1901. "Mr. V. M. Lefebvre, Plaquemine, La.

"Dear Sir. We hereby agree to furnish you 30, double track, skeleton, cane cars, as per the attached specifications, at $145, each, delivered at Australia Plantation. We agree to furnish a man to superintend the putting up of the cars after they are received at the plantation. Terms, $1000, cash, on the arrival of the cars; balance due, by note payable Dec. 15th,

with interest at 6% from date of shipment. Cars to be shipped as early as possible in September. Very truly yours.

"[Signed]        Chattanooga Car Co.
"Accepted.        [Signed] V. M. Lefebvre."

Plaintiff alleges that the cars were manufactured and delivered agreeably to this contract; that defendant has paid $613.63 on account of the price; and that there is due a balance of $3,736.37, for which he prays judgment, with recognition of the vendor's lien on the cars.

Defendant denies the allegations of the petition, save as specially admitted. He admits the execution of the contract sued on, which, he alleges, was negotiated with Louis Kaufman, plaintiff's agent in New Orleans. He further alleges that Kaufman was aware that the cars contracted for were to be used in transporting from the fields to the factory the cane crop for the year 1901 on defendant's plantation; that he was notified that defendant wished to begin grinding not later than October 10th, and that it was of the essence of the contract that the cars should be shipped as early as possible in September; that, relying on the discharge by plaintiff of his obligation in the premises, defendant constructed at his factory a railroad switch yard and carrier feeder, so as to provide for the delivery of cane in cars, instead of carts, as theretofore; that he made repeated demands upon plaintiff, through his said agent, during the month of September, 1901, to make delivery of said cars according to contract, but that said agent finally admitted that it would be impossible for him to do so, and that the cars were not shipped during the month of September, but at a later date; that, even after their shipment, by reason of the negligence of the plaintiff, they were not seasonably delivered, and, when delivered, were defective, and had to be made good at an expense of $100; and, that plaintiff failed seasonably to furnish a man to put them up. Defendant further alleges that by reason of the failure of the plaintiff to comply with

his contract in the particulars mentioned he was unable to begin grinding until October 29th, and then only with an inadequate equipment; that he notified plaintiff, through his agent, that, although he would be compelled to use the cars as furnished, he would hold him responsible for the loss resulting from the delay in their delivery; that, despite his best efforts, 10,000 tons of cane remained unground on December 14, 1901, when a freeze occurred, which destroyed 5,000 tons, and reduced the yield of the balance by more than one-half; that said cane was worth $4 per ton; and that the loss amounts to $30,100, the whole of which is attributable to plaintiff's breach of his contract; and he prays for judgment in reconvention for that amount.

There was a verdict and judgment for plaintiff on the main demand as prayed, and for defendant on the reconventional demand in the sum of $21,000, and plaintiff has appealed.

The evidence shows that 23 of the cars called for by the contract were shipped from Chattanooga October 11th; that they reached Australia plantation part of them on the 17th, and the rest on the 22d; that the plaintiff began grinding on the 29th of that month, and that he thereafter operated his mill to its full capacity, Sundays excepted, until December 13th, when he stopped on account of a hard freeze, and, resuming about the 21st, continued to grind, profitably, for three or four days, and thereafter, unprofitably, until January 4, 1902, when the mill was shut down. The seven remaining cars were shipped at a later date, and reached the plantation about November 10th, but it does not appear that the plaintiff would have ground any more cane if they had been included in the first shipment, nor does it appear that the delay which ensued between the first shipment, on October 11th and the starting of the mill on October 29th was attributable to the fault of the plaintiff, part

of that delay having been necessary for the transportation and putting together of the cars, and part of it having been unnecessarily occasioned by the failure of the steamboat St. John to take to the plantation, from New Orleans, at one time, the entire shipment received by it, at one time, from the railroad company by which it had been brought from Chattanooga. Assuming that the same delay would have occurred if the plaintiff had shipped the cars on the last day of September, the defendant would have begun grinding on October 19th, and accepting December 24th as the last day on which he was able to grind profitably, he would have had 67 days, less nine Sundays and less 7 days during which he was unable to grind on account of the frozen condition of the cane, or 51 working days, within which to take off his crop. Beginning, as he did, on October 29th, and ending on December 24th, he had 57 days, less 7 Sundays and 7 days of frozen cane, or 43 working days, within which to take off his crop.

The defendant asserts that he had 650 acres of cane for the mill, and, whilst the evidence upon the subject is rather estimative than positive, that number may be accepted as correct, after deducting 58⅝ acres, the cane upon which belonged to his tenants.

The tonnage per acre is left somewhat more at large. At one time the defendant, referring to the entire 650 acres, says: "I suppose the average tonnage, from what I had weighed, was about 25 or 26 tons to the acre." At another time he testifies that he had from 125 to 150 acres of "spring plant," which was bad, and did not average more than 15 or 20 tons to the acre; from 215 to 225 acres of "fall plant," which averaged from 25 to 30 tons to the acre; and about 300 acres of "stubble," which averaged from 30 to 35 tons to the acre. And from this his counsel present the following figures as the basis of their argument, to wit:

| | | |
|---|---|---|
| 125 acres, spring plant, averaging 17½ tons | | 2,187 tons |
| 225 " fall " " 27½ " | | 6,187 " |
| 300 " first years stubble averaging 32½ tons | | 9,750 " |
| 640 acres yielding total crop of | | 18,124 tons |

According to these figures, the entire crop averaged something over 27½ tons to the acre, whereas the plaintiff himself had "supposed, from what he had weighed," that it averaged 25 or 26 tons to the acre; and, whilst the other witnesses sworn on his behalf were not, as a rule, interrogated about the "spring" and "fall" plant, they were interrogated concerning the stubble, and none of them testify to a higher estimative average than 30 tons per acre. Our conclusion, then, on this point, is that the figures should be stated as follows:

| | |
|---|---|
| 125 acres, spring plant, averaging 15 tons per acre | 1,875 tons |
| 225 acres, fall plant, averaging 25 tons per acre | 5,625 " |
| 300 acres, stubble plant, averaging 30 tons per acre | 9,000 " |
| 640 acres yielding a total crop of | 16,500 tons |

Averaging, say, 25¾ tons to the acre. The result thus obtained tallies fairly with the testimony given by defendant and his witnesses concerning the result obtained from the cane actually ground. Thus it is said that there were left in the field 50⅝ acres belonging to tenants and 219⅝ acres belonging to the defendant, or a total of, say, 270½ acres, from which it would follow that the defendant actually ground 379½ acres of cane, and, as he testifies that he made about 1,500,000 pounds of sugar, and that the cane yielded about 150 pounds of sugar to the ton, it would also follow that he ground about 10,000 tons of cane; and, as 379½, the number of acres ground, multiplied by 25¾, the average tonnage, as shown above, gives a total of 9,772⅝ tons, the approximation is near enough for the purpose.

The defendant also testifies, however, that he ground 350 tons of cane a day whilst the mill was in operation, and he is corroborated

by Blouin, his engineer; their testimony upon that subject reading as follows: V. M. Lefebvre:

"Q. You say you ground 350 tons a day? A. Yes, sir. * * * Q. How many tons a day did you grind the year before? A. About 250. * * * Q. Do you know how many tons you have ever ground in 24 hours? A. Yes, sir. Q. Is it not merely a guess? A. No, sir. Q. Did you actually weigh any of the cane you ground last year? A. Yes, sir. Q. For the purpose of ascertaining how many tons you ground in a day? A. Yes, sir; I do that every year. * * * Q. How do you arrive at the capacity of your mill? A. By actually weighing .the cane."

E. O. Blouin:

"What is the capacity of the factory? A. 350 tons a day, 23 hours. Q. You have tested that capacity? A. Yes, sir. Q. What amount of cane did you grind from the time you started up to the time of the freeze? A. We ground every day full capacity. We have not lost any time? Q. You estimate that capacity 350 tons in 24 hours. A. Yes, sir. Q. No delays whatever? A. No delays."

If this testimony be accepted as true, it would follow that in the 43 working days, between October 29th and December 24th, inclusive, the defendant ground 15,050 tons, out of his total crop of 16,500 tons of cane. Beyond this, it is admitted that of the cane left in the field the defendant is not entitled to recover for 1,100 tons which belonged to his tenants.

It is shown that the freeze occurred upon the night of December 13th, and that it was at once unusually early and unusually severe; that the plaintiff's agent was aware that it was of the essence of the contract that the cars should be shipped in September; that he was repeatedly requested during that month, and after its expiration, to have them shipped; that defendant was led to expect them from day to day, and for that reason did not undertake to change the elaborate and expensive arrangements made by him for delivering the cane to his mill in that way; and that the cane lost was worth $4 a ton. It is also shown that it was not in the power of the plaintiff to ship the cars

earlier than he did for the reason that other persons, with whom he had contracted, failed to deliver certain necessary parts; and that the defendant, as a matter of accommodation to the plaintiff's agent, and with a view to minimizing the damage with which he was threatened, reimbursed said agent the amount paid by him to the railroad company for the transportation of the cars from Chattanooga to New Orleans, and paid the freight on said cars from New Orleans to his plantation; the total amount thus paid being $613.63. Upon the other hand, it is not shown that the plaintiff was formally put in default in the manner provided by Civ. Code 1901.

### Opinion.

A fair reading of the contract sued on leads to the conclusion that the question, "How early in September would it be possible for the plaintiff to ship the cars?" was for him to determine, and hence that he had until the expiration of the last day of that month within which to make such shipment. The defendant was therefore in no position to put him in default prior to that time, and was under no obligation to do so afterwards, since the delay within which the shipment should have been made must then have expired, and the plaintiff could by no possibility thereafter have complied with his contract. Civ. Code, art. 1933, § 1; Payne v. James & Trager, 42 La. Ann. 230, 7 South. 457. Moreover, the inability of the plaintiff, whether acknowledged then or afterwards, to make the shipment within the time specified, it being shown that such time was of the essence of the contract, rendered the putting in default unnecessary. Nor does the fact that the defendant accepted the cars and paid the freight preclude his recovery of the damages shown to have been sustained by reason of the failure of the plaintiff to ship them within the time agreed on, since he was then threatened with a loss, which

it was at once his duty, his interest, and his right to minimize as far as possible, and his efforts in that direction ought not to be allowed to operate to his prejudice.

We agree with the judge a quo that the fact that the freeze in 1901 occurred earlier and was more severe than usual is entitled to no consideration. It is a matter of public and historical knowledge that sugar cane is an exotic in this state, and that a freeze at some time between the beginning and the end of the short grinding season is a danger by which each successive crop is threatened. It was to provide against this danger that the defendant was particular to stipulate that the cars in question should be shipped in September, and the event justified the precaution. To hold that he can derive no advantage therefrom merely because the freeze occurred a few days earlier and the temperature fell a few degrees lower than usual would be wholly unreasonable, since neither of these contingencies are beyond the range of possibility, or even of reasonable expectation.

In his efforts to prove the loss sustained by him, the defendant and his engineer have testified most positively that his mill was capable of grinding 350 tons of cane per day, and that it did so from the 29th of October to the 24th of December, inclusive (save upon 7 days of freeze and 7 Sundays, a period of 43 days), the purpose, no doubt, being to satisfy the jury that the defendant could have taken off his entire crop before the freeze if he had not been delayed in starting his mill by the failure of the plaintiff to furnish the cars. He, however, proved too much, since in 43 days, at 350 tons a day, he must have ground 15,050 tons of cane, whereas his entire crop, as we have seen, amounted to 16,500 tons, of which, 1,100 tons belonged to his tenants, so that the amount of his loss appears to have been, 16,500—(15,050+ 1,100) 16,150=350 tons, instead of 10,000, or 7,500, tons, as stated in the answer.

On the other hand, the defendant also testified that in the 43 days during which his mill was operated he made about 1,500,000 pounds of sugar, and that the cane yielded about 150 pounds to the ton, from which it would appear that he ground only 10,000 tons of cane, or, say, 232⅝ tons a day. This latter view seems the more probable of the two, and was, no doubt, adopted by the jury, as it has been by the defendant's counsel for the purposes of their argument. We are of opinion, however, that the defendant cannot be heard to establish a fact for one purpose and deny it for another, and, since he has chosen to attempt the establishment of facts which are irreconcilable with each other, he must abide by that which is least favorable to his case, and, so doing, his right of recovery must be limited to $1,400, being the value of 350 tons of cane at $4 a ton.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by reducing the amount allowed to the defendant on his demand in reconvention from $21,000 to $1,400, and by condemning him for the costs incurred in the lower court in the prosecution of the main demand, and, as amended, affirmed; the plaintiff and appellee to pay the costs of the appeal.

PROVOSTY, J., concurs in the decree in so far as it goes, but holds that the judgment in favor of defendant should be much larger.

### On Rehearing.

(June 30, 1904.)

BREAUX, C. J. Plaintiff and appellant and defendant and appellee have presented petitions for rehearing, and each complains of the decree heretofore rendered, and urges a number of grounds of objections.

We take up those of plaintiff and appellant for decision.

Were we to adopt the theory of plaintiff and appellant, viz., that we should make the

difference between the costs of feeding the cane to the carrier by hand and from the cars under the old method, and not the value of the cane, the basis and measure of damages, we would change the issues, and adopt another basis or measure of damages than that argued in the district court and decided by that court.

Besides, the record informs us that the appellee and defendant had made changes at his mill and sugar house in order to be in readiness to use the cars bought by plaintiff in taking off his crop. We think that in view of that fact the measure of damages should be the loss of the cane as heretofore decided. The changes at the mill and sugar house were occasioned by plaintiff's promise that he would deliver the cars in time.

These changes of improvements had taken some time, and required some expenditure of money.

Defendant had a right to expect the cars in question in time to take off his crop. It was scarcely to be expected of him that he would take out the improvement, and return to the old way, in view of the fact that he was not warned by plaintiff of the delay which resulted afterward in the loss of a considerable part of his cane. Plaintiff and appellant had bound itself to deliver these cars within a certain time. Plaintiff and appellant must have known that the sugar crop must be taken off within a certain time, or that loss would be the result.

We take it that that which is clearly suggested by able and learned counsel after the fact, and which has now some appearance of reason, was not apparently reasonable prior to the fact.

Plaintiff now thinks that defendant should have resorted to efforts to protect himself from injurious consequences, which does not appear to us defendant can, with great reason, be held to.

"Reasonable effort and moderate expenses" are the test in matter of minimizing dam-

ages. Here the effort, under the circumstances, would not have been very reasonable. It would have required expense and a change in the improvement the defendant had made, in anticipation of receiving the cars in time. Besides, it was not for him to foresee that plaintiff would delay as long as it did before sending these cars. He was by that contract kept in expectation that the cars would be received. He could scarcely be expected to change front as it were, disregard the contract, and ex mero motu go to work at tearing up things and restoring the old situation of things at the sugar house.

With reference to dismissing defendant's reconventional demand, as suggested by plaintiff, and the further suggestion to relegate him to another suit under a reservation of his right to claim not for the value of the cane, but the difference between feeding the carrier by hand and feeding it by cars, we repeat that it appears to us too late to make that change.

The demand in the district court was for the loss of the crop. It cannot very well be changed on appeal. Besides, the damages suffered, after all, was the loss of the crop.

It is not shown that defendant increased the damages, or did not seek to minimize them.

The plea of the want of default is another of plaintiff's pleas in which we have found no great merit.

As relates to default vel non, plaintiff had no special right to expect that it would be reminded by defendant of its delays in not delivering the cars it had sold. It certainly devolved upon it to slightly bear in mind the promise made to deliver them in the time stipulated.

Moreover, the contract was one which, upon the face of the papers, was suggestive of necessity of delivering the cane cars in time to enable defendant to grind his crop of cane. The contract and all the circumstances relieved the defendant from the neces-

sity of putting the plaintiff in default. Plaintiff unquestionably failed to deliver the cars to enable defendant to save his whole crop.

The article of the Code is decisive of the question of the default. The thing "was of such a nature that it could only be done within a certain time." The putting in legal delay was not a condition precedent to entitle the creditor to damages. Civ. Code, art. 1933.

If the foregoing grounds stated, do not hold good, then in the alternative plaintiff is pleased to urge that the defendant, by accepting the cars without protest, by using them, and requesting further time to settle until after grinding, waived all claims that he (defendant) had.

There was surely no express waiver. The acts and utterances which plaintiff sets up as waiver do not amount to an abandonment of all right to damages. Defendant did for the best under the circumstances. When the cars were delivered he made use of them as hastily as he could. What else was he to do? He would have exposed himself to the charge of not having availed himself of the inviting opportunity offered to save his crop if he had not used these cars. They were sent to be used. Plaintiff can derive no defense from the fact that they were used.

The use, as made, did not lessen plaintiff's liability growing out of unreasonable delays in shipping them to the defendant.

Able and learned counsel urge with force and clearness that it was defendant's duty to minimize the damages so far as possible. In answer we can only say that this minimizing could best be accomplished by using the cars.

They, we infer, were highly satisfactory appliances in hauling cane.

It follows that the use of these cars at the earliest date possible was not a waiver under the circumstances of this case, nor was it an act which can be construed into an intended abandonment of damages growing out of the unseasonable delivery of the property sold.

One of the objections of plaintiff is well founded. In ascertaining why it is well founded it becomes necessary for us to state that plaintiff was the appellant, and defendant and appellee on appeal failed to sustain his judgment.

On appeal we have decided that plaintiff on the main demand is entitled to a judgment for $3,736.30, with 6 per cent. interest thereon from October 11, 1901. Heretofore defendant recovered judgment against plaintiff for the sum of $21,000 and 5 per cent. interest from the date of the judgment, subject to $3,736.37 as a credit.

The judgment of defendant against plaintiff on his reconventional demand has been reduced by our original judgment from $21,000 to $1,400. Defendant failed to sustain his judgment obtained in the district court on his reconventional demand.

It follows that plaintiff is entitled to judgment on the first amount, which has always been recognized as due, subject to the said $1,400 as a credit, and that to that extent the judgment of the district court is amended.

With reference to costs of appeal, they should be paid by appellee. Costs follow judgment. The judgment was amended on appeal at defendant's costs.

We take up for consideration defendant and appellee's application for an increase of the amount allowed in our original decree.

The points on the part of each side to this controversy have been ably and forcibly urged by respective counsel.

The defendant and appellee stoutly objects to the amount allowed heretofore as damages, to wit, $1,400. He thinks it should be much larger, for his losses, he says, were serious; and doubtless they were.

It remains, however, that the onus of proof was with defendant and appellee on his re-

conventional demand. This court has taken a decided position heretofore in regard to the amount of damages. The able argument on rehearing has not resulted in changing the court's conclusion.

The defendant himself and his engineer made statements in regard to the capacity of the sugar mill and factory. They did not qualify those statements in any respect. They were weighed and passed upon by the court as made; that is, the statements of defendant and his engineer were made without qualification and modification of any kind.

Nothing was added to or taken from the force of these direct separate statements under oath regarding the capacity of the mill and factory. It should be borne in mind that they were the sworn statements of defendant and his engineer.

We do not think that we would be justified in going beyond this, and in assuming that these statements related only to the maximum capacity of the mill under ideal conditions, expressly arranged for the purposes of making a test, as was contended by defendant.

While we do not question the verity of the statements, it remains that this ideal condition arranged for a test is not shown by the testimony. The daily capacity for the stated number of days which the mill worked was added up, and by that means a result was arrived at.

We are constrained, under the rules of evidence, which we think should govern, to adhere to the capacity sworn to heretofore as indicating the daily output during the number of days stated; not more, not less.

Were we to take other testimony as a basis, it would remain as a fact that defendant would recover for a larger amount of damages than shown by his own testimony. This we cannot do. We must affirm our decree. We have no other alternative left.

For reasons assigned it is ordered, adjudged, and decreed that plaintiff have and recover judgment of the defendant for the sum of $3,736.37, with 6 per cent. per annum interest thereon from October 11, 1901, until paid, subject to a credit of $1,400, with 5 per cent. from the 17th day of October, 1902; and that defendant and appellee pay the costs of appeal.

With the amendment as above, our judgment before rendered is reinstated and made the judgment of the court.

Appellee to pay costs of appeal.

PROVOSTY, J., dissents.