T. O. BANCROFT and Vada S. Bancroft

v.

INDEMNITY INSURANCE COMPANY OF NORTH AMERICA.

Civ. A. No. 8208.

United States District Court
W. D. Louisiana,
Monroe Division.

March 12, 1962.

Burt W. Sperry, Shotwell & Brown, Monroe, La., Clarence L. Yancey, Benjamin C. King, Cook, Clark, Egan, Yancey & King, Shreveport, La., for plaintiffs.

John C. Theus, Robert L. Curry III, Theus, Grisham, Davis, Leigh & Brown, Monroe, La., for defendant.

BEN C. DAWKINS, Jr., Chief Judge.

Presented here is an action for damages arising from an alleged breach of contract involving professional accounting services. It is brought by T. O. Bancroft, president of Bancroft Bag Factory, Inc., and his wife, of Monroe, Louisiana, against the professional liability insurer of a firm of Certified Public Accountants practicing in Monroe.[1]

The facts forming the basis of the suit occurred during an accountant-client relationship which had existed between plaintiffs and defendant's insured since approximately 1938, the insured having been employed originally by plaintiffs while Bancroft was operating as an individual, then as a partnership, and later as principal stockholder of Bancroft Bag Factory, Inc., and Bancroft Paper Company, Inc.

May 23, 1955, Bancroft directed a letter to a member of the insured firm in which he explained that several stockholders in the bag factory, who were children of the Bancroft family, owed money to the bag factory and that a plan had occurred to him which possibly would effect a means of payment with minimum tax consequences. The following question was asked:

"T. O. Bancroft, Sr. owns a certain amount of stock in the Bancroft Paper Company, Inc. This stock was acquired during the married life of T. O. Bancroft, Sr., and Vada Speed Bancroft, and is community property. Would it be possible, and

---

1. The suit is brought under the Louisiana Direct Action Statute, LSA–R.S. 22:655 (1950).

not in violation of any law, for a sufficient amount of this stock to be sold to the Bancroft Bag Factory, Inc., and one-half of the sale price to be credited to Vada Speed Bancroft account on Bancroft Bag Factory, Inc. books, and one half sale price credited to T. O. Bancroft, Sr. on Bancroft Bag Factory, Inc. books, and these credits could set-off the debit charges by gifts from Vada and myself to the three children at the rate of legal gift limits per year until the accounts are balanced.

"The Bancroft Paper Company stock is Par $100.00 per share, and is maintained at that value by the distribution of dividends and bonuses each year.

"Please let me have your opinion in writing concerning this proposal."

The insured C.P.A. replied May 25, 1955, in a letter addressed to Bancroft, in the following language:

"Reply to your letter of May 23, 1955, is made as follows:

"You and Mrs. Bancroft propose to sell a certain amount of Bancroft Paper Company, Inc. stock at $100.00 per share to Bancroft Bag Factory, Inc. We understand that Bancroft Paper Company, Inc. stock has been kept at a book value of about $100.00 per share by the payment of dividends and that its selling price is $100.00 per share and your cost is the same amount per share. In our opinion, there would be no Federal or Louisiana income tax on the sale of the stock.

"We further understand that you are not to receive cash for the stock but that a credit will be set up for you and Mrs. Bancroft on the books of the Bancroft Bag Factory, Inc. Each calendar year you propose to make a gift of $3,000.00 to each of your three children by crediting their account due the Bancroft Bag Factory, Inc. and charging your account. Mrs. Bancroft will do likewise. The total gifts to the three children will be $18,000.00 annually.

Such a transaction would not involve any Federal Gift Tax as a person may give $3,000.00 (the maximum annual exclusion) per year to as many individuals as he may choose without gift tax."

Relying on this advice, September 15, 1955, plaintiffs sold 410 shares of their stock in the paper company to the bag factory for $41,000.00; and October 18, 1957, they sold an additional 187 shares of paper company stock to the bag factory for $18,700.00. These two transactions were accomplished by bookkeeping entries on the accounts of the two corporations, the two sums being credited to plaintiffs' accounts on the books of the bag factory, thereby satisfying their children's indebtedness and leaving a credit balance. Following the 1955 transaction, plaintiffs' accounts in the bag factory were debited for $8,149.17 and the accounts of their children were credited with an equal amount to reflect gifts from the parents to the children.

In 1959, the Internal Revenue Service audited plaintiffs' income tax returns, including those for 1955 and 1957, and subsequently notified them that the two stock transactions were subject to the provisions of Section 304 of the 1954 Internal Revenue Code (26 U.S.C. § 304); that the sums received by plaintiffs from the sales of stock in 1955 and 1957 would be treated, for tax purposes, as dividends and taxed accordingly. The government's position was summarized in a letter dated December 1, 1959, from the office of the District Director, Internal Revenue Service, addressed to plaintiffs. After listing net adjustments (increases) to taxable income in the sum of $41,000.-00 and describing them as "Dividends from Bancroft Bag Factory, Inc.," the letter explained:

"(1) The sale of 410 shares of stock of Bancroft Paper Co., Inc., in year 1955 to Bancroft Bag Factory, Inc., and the sale of 187 shares of stock of Bancroft Paper Co., Inc., to Bancroft Bag Factory, Inc., in year 1957, by the taxpayers, constitutes a distribution in redemption of the

stock of Bancroft Bag Factory, Inc., in the amount of the sales proceeds. The proposed adjustment is to include in income the dividends resulting from the redemption. See Sec. 304 of the Internal Revenue Code of 1954. The assessment of additional tax in year 1955 is not barred by the statute of limitations because of the omission of over 25% of the amount of gross income stated in the return. See Sec. 6501(e) of the Internal Revenue Code of 1954."

In an effort to reach an accord with the Internal Revenue Service and for purposes of securing a review of the adjustments, an informal conference was held among Bancroft, representatives of the Internal Revenue Service, the insured C.P.A., and D. C. Bernhardt, an attorney and certified public accountant then representing plaintiffs. The insured C.P.A. testified that all parties agreed that the assessment was owed for the stock sales in 1955 and 1957:

"Q   You agreed to the assessment by the Federal Government and, in substance, told Mr. Bancroft he would have to pay it; isn't that right?

"A   Yes, sir.

"Q   When did you tell him he would have to pay it? Would that be before this conference or after it?

"A   No, sir. In this conference we all agreed the tax was owed. I don't believe the computation was made that day, but we discussed the items to be included in the settlement and he later submitted a computation to me of the tax.

"Q   That result, * * * was very different from the advice set forth in your letter of May 25, 1955, that there would be no tax?

"A   It sure was.

"Q   How do you account for the results you got—let us say, bad result?

"A   I simply, in my research, missed the new law.

"THE COURT: What section was it you missed?

"A   304.

"THE COURT: Of the 1954 Code?

"A   Yes, sir.

"BY MR. KING:

"Q   Didn't you just, frankly, admit to Mr. Bancroft that you made a mistake?

"A   Yes, sir.

"Q   When you say you missed this Section 304, you were not aware of it, or what do you mean by that, * * * ?

"A   I think when he posed the question, or rather outlining there was no profit or loss in the question, I simply didn't carry my research far enough.

"Q   It was there.

"A   The Section was there, yes, sir.

"Q   Didn't the section fit this pretty much like a glove?

"A   I would say so.

"Q   Has there been any change in that law since then?

"A   Not that I know of."

The insured further testified that he considered himself employed by Bancroft and his wife at the time the advice was given and when the 1955 stock transaction occurred. He also testified, as did Bancroft, that the latter paid the assessment on the strength of his opinion that the additional tax was due, Bancroft thus relying further, at least partially, at the date of the extra assessment, on the professional advice of the insured.

Following the conference, adjustments were made by I. R. S., including an allowance for the tax-exempt gifts from the parents to the children, and a total additional assessment for the years 1955 and 1957 was fixed at $35,419.74. This amount was paid to the government April 5, 1960, and is the sum sued for here.

Defendant denies liability to plaintiffs for the amount of the additional income tax paid on the grounds that, notwith-

standing payment of the extra assessment, the taxes were not legally owed under Section 304 and related sections of the Internal Revenue Code of 1954; that its insured did not fall below the standard of reasonable care required of professional accountants in advising his clients as to their tax problems; that, assuming the advice given plaintiffs was erroneous and the result of professional negligence, plaintiffs were not "justified" in relying thereon in the transactions which occurred, in the first instance, approximately four months and, in the second, two years and five months after rendition of the written opinion; that the insured C.P.A. committed a criminal act within the meaning of LSA–R.S. 37:213 (1950)[2] by engaging in the unauthorized practice of law and, therefore, the terms of the professional liability policy did not extend coverage to include this.

We must, accordingly, determine the duty owed to plaintiffs by the insured. Accountants, "a skilled professional class * * * subject generally to the same rules of liability for negligence in the practice of their profession as are members of other skilled professions," have been held liable for damage to clients resulting from malpractice in actions founded both on contract and tort. See Smith v. London Assur. Corp., 109 App. Div. 882, 96 N.Y.S. 820 (1905), and anno-

tation in 54 A.L.R.2d 324. In Gammel v. Ernst & Ernst, 245 Minn. 249, 72 N.W. 2d 364, 54 A.L.R.2d 316 (1955), the Court stated: "Ordinarily, the standards of reasonable care which apply to the conduct of auditors or public accountants are the same as those applied to lawyers, doctors, architects, engineers, and other professional men engaged in furnishing skilled services for compensation."

■ This standard, which requires that an accountant exercise that degree of skill and competence reasonably expected of persons in his profession in the community, is implied in the contract for professional services and is brought about by the accountant-client relationship. The contract, therefore, creates the relationship out of which arises the duty to exercise reasonable care to render skillful performance according to local professional standards. Hawkins, Professional Negligence Liability of Public Accountants, 12 Vand.L.Rev. 797 (1959), and 54 A.L.R.2d 324, et seq.

■ Before considering the several defenses asserted, it should be noted that, although defendant does not so contend in its brief, a question was raised by the Court at pre-trial and during trial as to whether plaintiffs' action is premature because of failure to exhaust administrative remedies within the I.R.S. by applying for a refund of the additional taxes paid for 1955 and 1957.[3] Signifi-

---

2. LSA–R.S. 37:213 (1950) provides, in pertinent part:

"No natural person, who has not been first duly and regularly licensed and admitted to practice law by the supreme court of this state, * * * shall:

"(1) Practice law;

"(2) Make it a business to solicit employment for a lawyer;

"(3) Furnish attorneys or counsel or an attorney and counsel to render legal services;

"(4) Hold himself out to the public as being entitled to practice law;

"(5) Render or furnish legal services or advice;

"(6) Assume to be an attorney-at-law or counsellor-at-law;

"(7) Assume, use, or advertise the title of lawyer, attorney, counsellor, advocate, or equivalent terms in any lan-

guage, or any phrase containing any of those titles, in such manner as to convey the impression that he is a practitioner of law; or

"(8) In any manner advertise that he, either alone or together with any other persons, has, owns, conducts, or maintains an office of any kind for the practice of law. * * *"

3. Defendant, in its original brief on the merits, states:

"At the pretrial conference and again during the trial of this case, the possibility that this proceeding may be premature was raised. Defendant was not of the understanding at those times that the question was whether or not complainants had exhausted their administrative remedies, and we do not so contend now."

cantly, the time within which to file for a refund has not lapsed.

We find, however, that, even if the point is brought up later, defendant could not successfully urge that plaintiffs' action is premature. The law makes the filing of a claim for refund of taxes a condition precedent to *a suit for refund.* This is required, however, only where the suit involves review of an administrative determination by the I.R.S. It is not applicable to a suit for damages resulting from the professional negligence of a public accountant. United States v. Failla, 219 F.2d 212 (3rd Cir., 1955), England v. United States, 261 F. 2d 455 (7th Cir., 1958), Westchester Fire Ins. Co. v. United States, 138 F.Supp. 788 (S.D.N.Y., 1955). There are a number of other cases where the administrative remedy must be exhausted before resort can be had to the Courts; but here there is no statute requiring plaintiffs to take such steps before bringing this suit. Cuiffo v. United States, 137 F. Supp. 944 (Ct.Cl., 1955).

Plaintiffs are not seeking to have this Court review an allegedly invalid administrative determination; rather, they are suing for breach of contract for professional services by a certified public accountant and seeking relief against that accountant's professional liability insurer. In the absence of a statute requiring exhaustion of administrative remedies as a prerequisite to suit, the Court may entertain the action if, in its discretion, it thinks the circumstances are appropriate for it to do so. Adler v. United States, 146 F.Supp. 956 (Ct.Cl., 1956).

■ Moreover, the rule that administrative relief must be exhausted before resorting to the Courts did not originate in the Constitution, or any statute, but derived simply as a matter of judicial policy created by the Courts, which do not apply it in hidebound fashion. The rule will not be followed if there is good reason for making an exception, and that has been done by both the federal and state Courts. United States v. Harvey, 131 F.Supp. 493 (N.D.Tex., 1954) and authorities therein cited.

The circumstances here justify such an exception, if there is need for justification, because, as noted above, the insured specifically advised Bancroft during the informal conference held with I.R.S. that there was no way to avoid payment of the tax. Bancroft also testified that agents of I.R.S. discouraged him from filing for a refund; that he was assured by Bernhardt that the assessment was properly made and the tax was owed; that George A. Lambert, a former District Director of Internal Revenue for the District of Louisiana from 1952 until 1954, advised him that the assessment was proper and the tax was owed; and that he was told, in the event he questioned the assessment upon application for a refund, that other adjustments and categories of possible tax liability might be reappraised by I.R.S. and additional taxes assessed. The insured and Lambert also testified as to the correctness of the extra assessment at the trial. For these reasons, we believe that Bancroft acted reasonably in relying upon the advice of the insured, and the others mentioned, in not applying for a refund.

■ It is elementary that one who is injured by the wrongful act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid undue loss or to minimize or lessen the resulting damage. He is bound to protect himself if he can do so with proper effort or at trifling expense, and can recover from the negligent person only such damages as he reasonably could not have avoided. Stated another way, he must do all that he reasonably can to mitigate his damages and he must do nothing to aggravate his loss. See Commodity Credit Corp. v. Rosenberg Bros. & Co., 243 F.2d 504 (9th Cir., 1957), Campfield v. Sauer, 189 F. 576 (6th Cir., 1911), Chattanooga Car & Foundry Co. v. Lefebvre, 113 La. 487, 37 So. 38 (1904), Gus Mayer Co., Ltd. v. United States Fidelity & Guaranty Co., 13 La.App. 642, 128 So. 63 (1930).

Bancroft, a mere layman in the field of tax law, sought advice from the insured both before and after the assessment. Due to an error by the insured, he was subjected to the additional tax assessment. Thereafter, but prior to paying it, he sought further professional advice from the insured; from Bernhardt; from Lambert, and from representatives of I.R.S. In response to these inquiries, he was advised that the tax legally was owed and properly assessed and that he would be unsuccessful if he attempted to obtain a refund.

It is clear, we think, that Bancroft acted as a reasonable, prudent, and diligent man in his efforts to secure advice and, in turn, to minimize his tax liability for the years involved. It was in further reliance on the professional advice of the insured, as well as other qualified persons, that he did not file for a refund. It is unnecessary, therefore, to determine the legality of the assessment made because, assuming its invalidity, the insured advised plaintiffs that the assessment was valid and that the tax was owed, thereby leaving them with a single remedy, namely this action on the policy for damages caused by professional negligence.

Even though the delay for making a refund application has not lapsed, it would work an injustice and inequitable hardship on plaintiffs to require that, notwithstanding the accountant's advice to the contrary, a refund be applied for and denied before this suit may be maintained. Moreover, failure to file for refund is no defense to this action against the liability insurer if it would not have been a valid defense to a suit against the insured. See Banks v. Assoc. Indemnity Corp., 161 F.2d 305 (5th Cir., 1947).

■ As noted, defendant argues that plaintiffs were not "justified"[4] in either instance in relying on the written opinion which was rendered some four months prior to the first stock sale and approxi-

mately two years and five months prior to the second. We find that plaintiffs were reasonable in their belief that the advice given four months earlier was correct and still reliable when the first sale occurred.

Not having been challenged about the first transaction by I.R.S., plaintiffs understandably followed the identical procedure in selling the stock in 1957. The insured having been retained as plaintiffs' C.P.A. and tax consultant for approximately seventeen years, surely plaintiffs were entitled to believe that, should a change in the Code have occurred within the four-months period, the insured would have notified them of it. Bancroft testified that in selling the stock in both 1955 and 1957 he relied on the advice of the insured. But for the insured's advice and the failure of the I.R.S. to question that transaction, presumably the 1957 stock transfer would not have been effected and that loss would not have occurred. It is reasonable to conclude, we think, that as time passed without objection from I.R.S. or notice from the insured Bancroft was justified in having confidence in the plan and in following the same procedure for sale of the additional stock in 1957.

■ Defendant contends that the advice given plaintiffs by the insured C.P.A. was not within the proper area of accounting; that his opinion actually was a legal view which lawfully could be rendered only by a licensed attorney-at-law; that, therefore, the insured committed a crime within the purview of LSA–R.S. 37:213 (1950), and that neither he nor his insurer can be held liable for his negligently rendering legal advice because plaintiffs knew that he was not licensed to practice law.[5] Defendant urges, *ergo*, that its professional liability policy does not extend coverage to the risk of liability for its insured's performance of a criminal act.

4. Restatement of Torts, Sec. 552(b) (ii).

5. See Mandelbaum v. Gilbert & Barker Mfg. Co., 160 Misc. 656, 290 N.Y.S. 462 (1936), Annotation, 9 A.L.R.2d 797, 798, Agran v. Shapiro, 127 Cal.App.2d Supp. 807, 273 P.2d 619 (1954), and Morris v. Muller, 172 A. 63 (N.J., 1934).

■ Without judging the merits of the accounting profession's *de facto* rendition of quasi-legal services, we must take judicial notice of the fact that, in Monroe, Louisiana, as elsewhere, C.P.A.'s regularly render opinions and advise their clients on matters of federal and state income tax liability as a routine matter in performance of their professional services. As a matter of fact, attorneys-at-law frequently refer clients to C.P.A.'s for such advice, which is in a specialized field; and attorneys also seek such advice directly from C.P.A.'s. In writing the policy here sued upon, defendant is bound to have known of this almost universal practice.

This is further borne out by the testimony of the insured, who stated that he has rendered opinions and given advice as to tax consequences of various transactions during the whole of his professional career; and by the testimony of Lambert, who said that the problem was one both of accounting and taxation and it therefore was within the proper province of a C.P.A. to render an opinion on the probable tax results of the proposed stock transfer. We hold, therefore, that, had the action been brought against the insured, the mixed legal and accounting nature of the opinion would not have been a valid defense on the grounds urged by defendant, i. e., that plaintiffs knew the insured could not practice law.

Defendant further maintains that the policy itself does not extend coverage to include the risk of liability for professional negligence in rendering what defendant insists was a purely legal opinion. The insuring agreement provides, in part:

"1. *Accountant's Professional Liability*

"To pay on behalf of the insured all sums which the insured shall be-come legally obligated to pay for damages caused or alleged to have been caused by the insured, any predecessor in business, any accounting organization acting under contract with the insured or any partner or employee of any of the foregoing, in the performance of professional services for others, including but not limited to breach of contract,

"(a) through *neglect, error or omission*; [Emphasis supplied.]

"(b) through dishonesty, misrepresentation or fraud, except if made or committed by the insured or any partner with affirmative dishonesty or actual intent to deceive or defraud;

"(c) through civil libel or slander or defamation of character, except if committed by an insured in bad faith and except loss and expense due to criminal libel or criminal slander by the insured or by any partner or employee of the insured."

As we read the insurance contract, the form of liability for professional negligence incurred in this instance is reasonably included within the broad coverage of the policy, that is, liability for professional negligence occurring in a mixed area of accounting and law, a twilight zone where both professions find common ground and, in some instances at least, are equally competent to render expert advice. Authorities cited by defendant point up the deep significance of the professional disagreement between the American, State and local Bar Associations on the one hand, and the American, State and local Institutes of Accountants on the other.[6]

We ask this pertinent question: Had defendant not undertaken to insure against the risk of professional liability for negligence in rendering an opinion

---

6. For examples of the disagreement over the proper functions of attorneys-at-law on the one hand, and certified public accountants on the other, compare the following: Statement of Principles adopted by the American Bar Association and the American Institute of Certified Public Accountants in Volume 76, Reports of the American Bar Association for 1951, Hatfried, Inc. v. Commissioner of Internal Revenue, 162 F.2d 628 (3rd Cir., 1947), Haywood Lumber & Mining Co. v. Commissioner of Internal Revenue, 178 F.2d 769 (2th Cir., 1950), Burton Swartz

as to tax consequences, knowing full well that C.P.A.'s give such opinions every day, why was this not made a specific exception or exclusion in the insurance contract here in view of continuing disagreement between the two professional groups as to appropriate spheres of services for each?[7]

■ Because this policy was written without the insured having been consulted as to its form or content, under the rule of liberal construction, every reasonable effort should be invoked to secure coverage to the insured and in favor of the damaged parties. Collard v. Globe Indemnity Co., 50 So.2d 838 (1st Cir., La.App., 1951). Jones v. Standard Life & Acc. Ins. Co., 115 So.2d 630 (2d Cir., La.App., 1959), and authorities cited therein.

Moreover, we do not think that these plaintiffs, the damaged clients, should be left without a remedy because of the frustrated attempts of the two professions to delineate the outer limits of their respective activities and competence. Admittedly, there is a valid difference of opinion on this subject but we are not, in this ruling, attempting to further the cause of either side. *We are, however, protecting innocent clients who have been damaged by a C.P.A.'s professional negligence, from the hiatus which the professions themselves have been unable to resolve.*

■ Defendant submits that, if it is liable, its liability is considerably less than the $35,419.74 assessment paid by the Bancrofts to I.R.S.; that in the 1955 transaction plaintiffs did not lose their cost or basis in the Bancroft Paper Company stock because under Section 304 plaintiffs are treated as having made a contribution to capital of the bag factory in the sum of $32,850.83. Therefore, argues defendant, plaintiffs may sell their stock in the bag factory and recover not only their initial cost but $32,850.83 in addition without paying any income tax. Defendant concludes, therefore, that plaintiffs will be left in a superior position to that existing before the transactions occurred because besides receiving $32,850.83 "tax free," plaintiffs will have an investment in that amount which they may recover without taxes at any time in the future.

We are not impressed with this argument, first, because plaintiffs, through the sale, have lost direct ownership of the 597 shares of stock in the paper company, and those shares now belong to the bag factory. Next, if plaintiffs sell their stock in the bag factory in the future (which, because of the economic results, they are most unlikely to do), their increased cost or basis possibly may increase their income tax liability. Moreover, an increased basis, or cost, in the capital of the bag factory may be a tax benefit in some years but not in others, depending on the then status of the I.R.C. The future possibilities are too speculative to calculate with any degree of exactness and would depend upon many variables, e. g., the current market value of the stock, other income received in the same year by plaintiffs, and whether the stock is subject to estate taxes.

Finding the defenses asserted to be invalid, and for the reasons given, there will be judgment for plaintiffs as prayed.

Present decree.

Land Corp. v. Commissioner of Internal Revenue, 198 F.2d 558 (5th Cir., 1952), Commissioner of Internal Revenue v. American Assoc. of Engineers Employment, 204 F.2d 19 (7th Cir., 1953), Humphreys v. Commissioner of Internal Revenue, 88 F.2d 430 (2d Cir., 1937), Mandelbaum v. Gilbert & Barker Manu. Co., 160 Misc. 656, 290 N.Y.S. 462, 9 A.L.R.2d 797 (1936); Lowell Bar Ass'n v. Loeb, 315 Mass. 176, 52 N.E. 2d 27 (1943); 9 A.L.R.2d 797, In re

New York County Lawyers Ass'n, 273 App.Div. 524, 78 N.Y.S.2d 209, 9 A.L.R. 2d 787 (1948).

7. The only "Exclusion" contained in the policy here provides:
    "This policy does not apply to liability under the national 'Securities Act of 1933' or any amendment thereof, nor against loss and expense in connection with claims of liability asserted against the insured under said act."