364 So.2d 1352 (1978)
George W. GILL, Jr.
v.
Santo J. DiFATTA.
No. 9241.
Court of Appeal of Louisiana, Fourth Circuit.
November 13, 1978.
*1353 Dodge, Friend, Wilson & Spedale, Gordon F. Wilson, Jr., Richard S. McBride, Jr., New Orleans, for plaintiff-appellee.
Bordelon & Carimi, Darryl J. Carimi, Gretna, for defendant-appellant.
Before LEMMON, GULOTTA and BOUTALL, JJ.
LEMMON, Judge.
This appeal involves an attorney's suit against his client for fees allegedly earned and unpaid and the client's reconventional demand for damages allegedly caused by the attorney's malpractice. The trial court awarded part of the fees sought by the attorney and dismissed the client's reconventional demand for damages, and both parties appealed. Evidence in support of the two demands was presented separately, and each demand will be separately discussed.
Gill's Demand for Attorney's Fees
In June, 1969 Santo DiFatta employed George Gill to perform various legal services, as requested, for a fee of $25.00 per hour. Although DiFatta at the time was the principal mover in the proposed construction of a marina on property leased by Lake Island Realty Company from the Board of Levee Commissioners of the Orleans Levee District (Levee Board), Gill performed work in furtherance of the project only upon assignment of specific tasks by DiFatta.
During the next 19 months Gill handled numerous legal matters for DiFatta, but did not submit periodic bills for these services. In response to Gill's requests for payments on account during this period DiFatta made four payments, in various amounts totaling $4,000.00, the last being made on May 20, 1970. In February, 1971 Gill submitted an itemized statement for an additional $32,166.93 and subsequently sued for that amount. After trial on the merits judgment was rendered awarding $11,051.88 over and above DiFatta's payments, subject to another undisputed credit for certain expenses paid by DiFatta.
On appeal DiFatta does not contest the amount awarded (except implicitly as to the amounts charged for the services which allegedly constituted malpractice), and in fact he praised Gill's efforts in the handling of many matters covered by the statement. On the other hand, Gill's sole argument on appeal as to this issue is that two expert attorneys testified the fees listed on the statement were reasonable.
*1354 Of the fees disallowed or reduced by the trial judge, the first is a compilation of charges for office consultations. The reduction from the total amount itemized on Gill's time sheet represents a factual finding as to the number of hours proved, and Gill makes no showing of manifest error in this determination. Another reduction not seriously disputed by Gill is a $1,000.00 fee, lowered to $500.00, for certain work with the Levee Board, part of which perhaps represents duplication of other charges.
As to reductions in fees for three litigated cases, the parties had not agreed upon a fixed fee for any of the matters, and Gill had not kept time records. In the Bush case involving defense of a suit on a promissory note, Gill filed an exception and undertook discovery and other preliminary work in a matter which never went to trial. The reduction of a $4,634.33 charge (10% of the note sued upon) to $1,500.00 and costs does not constitute an abuse of discretion. In the Dominican case involving cancellation of a lease, the judge reasonably allowed 10% of the total amount of the gross payments in the primary term of the lease which Gill successfully defended, rather than 10% of the total payments, including renewals, as billed. And in the Vandervort case involving a partial fee for architectural work in planning the marina, there was no abuse of discretion in awarding $1,000.00 and costs for preliminary work when the case was ultimately settled by another attorney for $2,000.00.
Finally, denial of Gill's percentage charge for recovering two negotiable notes was not manifestly erroneous when the record shows only that the notes were returned voluntarily upon Gill's demand during a four-day trip to St. Louis, for which DiFatta paid him an agreed fee of $500.00 per day.
DiFatta's Demand for Damages
DiFatta's principal claim in the amount of $150,000.00 is based on allegations of Gill's substandard performance of legal services involving DiFatta's application for permanent financing of the marina project, particularly advice by Gill that certain documents were legally sufficient to protect DiFatta's interests. DiFatta argues that he sustained damages because he paid $150,000.00 to a bogus financing group in St. Louis in reliance upon that advice.
In the spring of 1970 DiFatta had not yet secured permanent financing for the $5,800,000.00 marina project, although several local banks had expressed willingness to provide interim financing during construction, if an acceptable commitment for permanent financing was obtained in advance of construction. Moreover, the lease with the Levee Board required completion of certain construction by September 14, 1970 (18 months after execution of the lease).[1]
Around April, 1970 Cecil Hilburn, an insurance agent, introduced DiFatta to Ben Feinstein, an insurance broker from St. Louis who claimed to represent a group of investors interested in financing large construction projects. It soon became evident that the investors were actually brokers, but under the tightening time pressure DiFatta pursued the lead. Eventually, DiFatta and Hilburn's partner met with the group in St. Louis, and DiFatta agreed to pay a 7% origination or broker's fee ($410,270.00) in advance for their obtaining a commitment for permanent financing on specified terms and to make a deposit of $50,000.00 by a certain date.
On May 11, 1970 (after DiFatta had not paid the $50,000.00 by the promised date) DiFatta and Hilburn's partner consulted Gill about the proposed transaction. (Gill contends he had nothing to do with the financing arrangements prior to this time.) DiFatta telephoned Joel Ginsburg, the St. Louis Broker, with Gill listening on an extension, and Gill overheard Ginsburg degrade *1355 and intimidate DiFatta. When Ginsburg told DiFatta the deal was off, the latter pleaded for continued assistance in obtaining financing. Gill, observing that no legitimate businessman would treat a customer in this manner, advised DiFatta against working with this group, but DiFatta said that he was "drowning" and the St. Louis brokers were his only hope to salvage his project.
DiFatta asked Gill and the vice-president of the bank that was to provide the interim financing to go with him to St. Louis to complete the application for a permanent financing commitment. At the last minute the banker was unable to make the trip, and Gill reluctantly accompanied DiFatta (according to Gill, in order to "read the papers") on May 18. After more intimidation and an extended meeting which lasted into the night, DiFatta agreed on a schedule of payments of the broker's fee, with Ginsburg insisting that the entire transaction, including placing the deposit with an escrow agent, be completed that evening. Gill took no part in the negotiations and advised DiFatta not to execute the contracts or to give the deposit, particularly in view of the unbusinesslike method of dealing, the high pressure tactics, and the fact that the escrow agent shared the suite of offices with the broker. When DiFatta insisted on going ahead, Gill reviewed the contracts and approved them from a legal standpoint as being legally sufficient to protect DiFatta if the St. Louis group lived up to their representations. Because the commitment was worthless if the Levee Board did not extend DiFatta's time for completing construction, Gill did require insertion of a provision that most of the money would be returned if the Levee Board did not extend the terms of the lease. DiFatta thereupon paid $50,000.00 to the escrow agent.
When DiFatta and Gill returned to New Orleans, the Levee Board at first refused to amend the lease, but because of Gill's diligent efforts the Board agreed on May 27 to an 18-month extension of the time for completing the improvements on the condition that an acceptable commitment for permanent financing would be forthcoming by June 26. Also on May 27 DiFatta, in accordance with his financing contract, sent to the escrow agent $100,000.00 in cash, two notes in the total amount of $110,000.00 which were secured by real estate, and a pledge of the monthly proceeds from the sale of a coin machine business.
The commitment, issued by Tangible Risk Insurance Company, arrived by mail on June 26, but investigation revealed that the company had no assets, and the Levee Board rejected the commitment. Gill and DiFatta attempted to obtain the return of the money and notes, but were successful only in recovering the notes. They then employed a detective agency, which performed an extensive investigation, and the St. Louis group ultimately pleaded guilty to scheming to defraud DiFatta.
As to the malpractice claim, DiFatta, admitting Gill was not responsible for his business decision, argues that Gill's legal advise about being protected by the contracts fell below the standard of care exercised by competent attorneys.
In support of this argument DiFatta presented an expert attorney who specialized in commercial real estate transactions. The expert opined that the mortgage commitment application "smacks of fraud" in that the 7% fee was exorbitant (1% was usual) and the requirement of advance money was suspicious, although he admitted an advance in escrow is often furnished, when the borrower's seriousness or solvency is unknown, to induce the broker to exert substantial time and effort. He also opined that the escrow contract "smacks of fraud" in that there was no provision for an escrow fee and no exculpatory provision for holding the escrow agent harmless, observing that while both of these provisions were for the benefit of the escrow agent and not the borrower, the absence of the provisions made the documents suspicious. He stated he would have advised his client against executing the documents or advancing money, at least without further investigation, and would have withdrawn his representation *1356 if the client had failed to heed his advice.
Under the record-supported facts accepted by the trial judge, Gill offered exactly that advice.[2] His suspicions arose from the method of dealing and the close association of the broker and escrow agent, before the documents were presented, rather than after reading the documents. But regardless of the basis for the advice, the fact remains that the advise was offered and rejected by a client who the record suggests was under extreme financial and time pressures and was so consumed with avarice and desperation that he was ripe for picking by confidence game operators.
DiFatta was damaged because he accepted the advice he wanted to hear (from Ginsburg and Feinstein, who insisted that the transaction be completed that night) and rejected the advice he dreaded hearing (from Gill, who suggested rejection of the deal or investigation of the suspicious circumstances).
DiFatta argues, however, that even if it were proved he refused to accept Gill's advice about doing business with Ginsburg, Gill did not withdraw representation, but continued on and improperly advised him the contracts were legally sufficient to protect him if Ginsburg's group turned out to be trustworthy.
As to the legal sufficiency of the contracts, the expert attorney pointed out that the commitment application incorrectly stated title was vested in Lake Island Realty. Thus, even if the ensuing commitment were otherwise valid, it would have been useless and valueless if issued on the basis that DiFatta's corporation was the owner rather than the lessee, since any mortgagee probably would have required subrogation of the lease. Other deficiencies were also pointed out, such as the lack of a requirement that the commitment be acceptable to the construction lender (although there was a provision as to minimum net assets of the permanent lender) and the lack of a requirement in the escrow contract that the commitment be submitted to the borrower for approval before disbursement of the funds.
An attorney who accepts employment holds out to his client that he possesses the knowledge and skill necessary to handle the matter for which he is employed. If the services involve a contract to be executed by the client, the attorney must scrutinize the contract and disclose the full import of the instrument and the consequences of its execution. Ramp v. St. Paul Fire & Marine Ins. Co., 263 La. 774, 269 So.2d 239 (1972). And when the attorney's performance falls below the standards of competence and expertise usually exercised by other attorneys in handling such matters, the attorney is liable for any damage to the client caused by his substandard performance.
In the present case the contract arguably had several deficiencies which might have resulted in substantial problems or losses by DiFatta.[3] Nevertheless, Gill's failure to note these deficiencies was not the cause of any damage to DiFatta.
The proper method of determining whether a party's omission to perform an act imposed by a duty is a cause in fact of damage to another is to determine whether performance of that act would have prevented the damage. In this case, if Gill had noted the incorrect designation of Lake Island Realty as owner, he should have corrected the application to designate the status as lessee, but the damage would still have occurred as it did. Therefore, his failure to note that deficiency cannot be said to be a cause in fact of the damage.
If the St. Louis group had been legitimate businessmen, DiFatta would have *1357 been entitled to the return of his funds under the contract approved by Gill, because the Levee Board never did approve the commitment. Even the expert attorney admitted the escrow agent could not properly have released the funds under the terms of the escrow contract.
DiFatta's damages therefore were not caused by his attorney's failure to note contract deficiencies, but by DiFatta's releasing money to persons who were running a confidence game, and his damages were incurred as soon as he did so against his attorney's advice based on indications these were not legitimate businessmen. DiFatta's complaints that the attorney failed to note deficiencies in the contract he insisted on signing and that these deficiencies could have caused problems which did not occur are simply not a basis for a malpractice action to recover the damages he did incur.
Finally, DiFatta also demanded damages for Gill's refusal to return the two promissory notes he had recovered. Gill testified that he originally retained the promissory notes because in executing a receipt he bound himself to return the notes to Feinstein, if timely proof were submitted of Tangible Risk's financial ability, and that he held the notes in pledge after October 12, 1970 because DiFatta induced him to continue his representation without further payments on the fee by authorizing him to hold the notes until the fee was paid. DiFatta denied pledging the notes to Gill.
The trial court did not specifically rule upon this demand, but the judgment implicitly denied it. Also implicit was the acceptance of Gill's testimony as to the pledge and the rejection of DiFatta's testimony to the contrary. There is no manifest error in this resolution of the conflicting testimony. Moreover, since mere delivery is the only formality required to prove a valid pledge of a negotiable instrument, the demand was properly denied.
The judgment is affirmed.
AFFIRMED.
NOTES
[1] Between June, 1969 and the spring of 1970 Gill had performed other legal services for DiFatta, including successfully resisting attempts to cancel the lease after DiFatta had been accused of organized crime connections and again after DiFatta had failed to comply with certain lease terms regarding insurance coverage.
[2] The trial court found as a fact, in the face of DiFatta's denials, that Gill had warned DiFatta against doing business with the group, furnishing money to them, and using a close associate as an escrow agent. The record provides ample support for this finding.
[3] For example, if a valid commitment had been issued to Lake Island Realty as owner, the commitment would have been worthless unless DiFatta could mortgage the leased property, but the origination fee would still have been earned.