**Richard A. GANTT, Trustee**

v.

**BOONE, WELLFORD, CLARK, LANGSCHMIDT AND PEMBERTON, et al.**

Civ. A. No. 77–464–A.

United States District Court, M.D. Louisiana.

March 17, 1983.

La., Lawrence J. Wojcik, Chicago, Ill., for defendants Hawthorn, Waymouth & Carroll Partnership, Howard V. Carroll, H. Daniel Carroll, Robert J. Zernott, Warren C. Ber, Robert E. Wales, Carl L. Hancock, J. Charles Parker and Henry O. Gaudet.

Donald S. Zuber, Seale, Smith & Phelps, Baton Rouge, La., James H. Manire, Manire, Harris, Shelton & Dunlap, Memphis, Tenn., for defendants Boone, Wellford, Clark, Langschmidt and partnership composed of William G. Boone, Jr., Donald R. Wellford, Kenneth F. Clark, Carl H. Langschmidt, Jr., Donald W. Pemberton, B. Percy Magness, Jr., and James H. Barton.

John E. Seago, Baton Rouge, La., Robert A. Kutcher, Martin L.C. Feldman, New Orleans, La., for defendants W.A. Moncrief, Sr., W.A. Moncrief, Jr. and Omni Capital Lumber Co.

JOHN V. PARKER, Chief Judge.

Plaintiff, Richard A. Gantt, as trustee for Turner Lumber Company (Turner), brought this action in contract and negligence alleging malpractice against Donald W. Pemberton and his law partnership, Boone, Wellford, Clark, Langschmidt, and Pemberton, and Robert E. Wales and his accounting partnership, Hawthorn, Waymouth and Carroll. The alleged malpractice involved the sale of Turner assets to other named defendants, Omni Capital Lumber Company, Richard H. Friedberg, W.A. Moncrief, and W.A. Moncrief, Jr., (Omni, et al) resulting in Turner's paying substantial state taxes on the sale. Pemberton and his partnership filed a cross-claim against Omni, et al, and Omni, et al filed a counter-claim against plaintiff.

Trial on the merits was to the court sitting without a jury. Following submission of post-trial briefs, this matter was submitted. Subsequently, the court was informed that defendants Pemberton and his law partnership have entered a settlement agreement with plaintiff and accordingly, an order of dismissal has been entered as to these defendants only. The court must now determine liability of the remaining defend-

Frank A. Fertitta, Baton Rouge, La., James R. Gilreath, Michael D. Layman, Dobson & Dobson, Greenville, S.C., for plaintiff.

Ben W. Lightfoot, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge,

ants, Wales and his partnership and the purchasers, Omni, et al, and liability under the cross- and counter-claims.

Jurisdiction of this court is predicated upon diversity of citizenship, 28 U.S.C. § 1332.

### FINDINGS OF FACT

Turner had extensive land holdings in Mississippi, South Carolina and Louisiana and was interested in negotiating the sale of the corporation. After a potential sale to International Paper Company fell through, Charles Turner, Turner's Executive Vice-President, was appointed by the corporation to attempt to negotiate the sale of the business. The directors were interested in either the corporation selling assets or the stockholders selling their Turner stock.

In May, 1976, Charles Turner met with Richard Friedberg to discuss a possible sale of Turner to Friedberg's corporation, Omni Capital Lumber Company (Omni). These negotiations culminated in the parties signing an option agreement on or about September 30, 1976, which provided for a sale by Turner to Omni of all its assets, except one-half its mineral rights, at a sales price of twelve million ($12,000,000) dollars. Due to title problems with Turner's Mississippi minerals, the option was subsequently amended to provide that Turner would retain its Mississippi minerals, and the total sales price was reduced to eleven million seven hundred fifty thousand ($11,750,000) dollars.

On or about November 29, 1976, Omni formally notified Turner that it intended to exercise the option. Prior to closing, the option was assigned by Omni to Richard H. Friedberg, W.A. Moncrief, and W.A. Moncrief, Jr. The Turner sale closed on December 20, 1976.

In September, 1977, Turner was liquidated and in liquidation transferred all of its remaining assets, including the claims which are the subject matter of this suit, to plaintiff, as trustee under a liquidating trust agreement.

Defendant Donald W. Pemberton, attorney, had been general counsel for Turner since 1965, and was retained to represent Turner in other matters. Pemberton was present during some of the negotiations with Omni, et al and was retained to prepare the option agreement and to handle the closing of the sale.

Pemberton structured the transaction to comply with Section 337[1] of the Internal Revenue Code so that sale by Turner to Omni, et al would be exempt from federal income tax at the corporate level. Although a Section 337 sale exempts the sale from federal income tax at the corporate level, it does not insulate the sale from state income tax, and the treatment of such sales by the states varies from state to state. Neither Louisiana nor South Carolina, where the assets were located, had a parallel statute.

Under the option agreement Omni, et al, agreed to pay certain items at closing, such as legal fees up to $35,000 plus approved expenses in connection with the consummation of the sale, unfunded pension costs, accounts payable and the taxes required to be accrued pursuant to paragraph 4(c), which states:

"In addition, there shall be accrued at closing an amount of money necessary to defray all income taxes (state and federal) on income earned by Company for the calendar year 1976; an amount to defray 1976 real estate taxes; and an amount to defray accounts payable. Such amounts shall be retained by the Company out of its cash funds, if such funds are sufficient. If such funds are insufficient, Omni agrees to supply such cash deficien-

---

1. 26 U.S.C. § 337. Gain or loss of sales or exchanges in connection with certain liquidations. (a) General rule. If, within the 12 month period beginning on the date on which a corporation adopts a plan of complete liquidation, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12 month period.

cies to pay for such accruals at closing. No other accruals shall be made."

Robert E. Wales, certified public accountant, and his firm, Hawthorn, Waymouth and Carroll, were retained by Turner late in 1973 as auditors and audited Turner annually from 1973 through 1976. Hawthorn also prepared Turner's federal and state tax returns. Prior to the time of the closing, Wales had never met any officer or director of Turner except George Barker, Vice President and Treasurer, who originally retained him. Neither did Wales attend any director's or shareholder's meetings.

After notice was given on November 29, 1976, that the option would be exercised, Pemberton, on December 3, 1976, telephoned Wales and requested an appointment to discuss accounting work needed to be performed for the Turner closing. Wales had no prior information that there was to be a sale, although Barker had informed him of the interest in selling expressed by a majority of the Board of Directors. On December 10, 1976, Wales met with Pemberton and his partner, James Barton, at Hawthorn's offices for approximately thirty minutes. Pemberton and Wales had not met prior to this time. During this meeting, Pemberton gave Wales a copy of the option agreement. This was the first time Wales saw the agreement.

Pemberton told Wales that he needed Turner's books brought up to date and that several accounting computations had to be made. In this regard, Pemberton pointed out § 4(c) of the contract to Wales. After reading the section, Wales asked Pemberton about the nature of the taxes to be accrued. Pemberton replied that only federal and state taxes *from operations* should be accrued. Then Wales asked about liquidation of the corporation and Pemberton told him that Turner would be liquidated under § 337 of the Internal Revenue Code. Pemberton told Wales not to concern himself with the liquidation because Pemberton's law firm was handling both the sale and liquidation.

Wales was aware that no provision similar to § 337 existed in the tax statutes of Louisiana and South Carolina and that the transaction would generate tax liability to both states. Wales admits that he thought of this fact during the meeting with Pemberton, but at no time prior to or through the closing did Wales discuss with Pemberton the fact that Turner would be liable for state income taxes if the sale was consummated under the option agreement. Wales' reason for not discussing the state taxes with Pemberton was because Pemberton had told him, "I am handling the liquidation. You don't need to worry about it."

Pemberton then told Wales that the closing was to take place in ten days, on December 20, 1976, and that all the accounting work had to be performed on an expedited basis. During the course of the meeting Pemberton related his earlier attempts to sell Turner and described his tax experience and background, which was extensive.

After the meeting with Pemberton and Barton, Wales met with his associate, James Flotte, to discuss the work to be performed for Turner. Flotte made notes during his discussion with Wales regarding the nature of the work required. His notes reflect, *inter alia,* Pemberton's instructions to accrue federal and state income tax from operations. Wales contacted George Barker regarding his discussion with Pemberton. Barker told Wales that Pemberton was handling the sale and liquidation and authorized the accounting work to be performed by Hawthorn.

On December 19, 1976, Wales attended a preclosing meeting at the offices of Omni's Baton Rouge counsel. During the meeting there was no discussion regarding state taxes which might result from the sale of Turner's assets. On December 20, 1976, Wales was again present at the office of counsel for Omni for a short preclosing meeting, and again there was no discussion regarding taxes resulting from the sale. Wales left the meeting before the actual closing took place.

Wales admits that usually in such situations he makes it a point to discuss the state income taxes owed with the client, however, Wales knew that Pemberton had been the

general counsel of Turner since 1965, that he had handled tax issues for the corporation since that date, and that Pemberton was handling the present sale and liquidation. Wales had no engagement letter or other written agreement with Turner regarding the scope of his duties on the Turner closing. Wales was paid a fee of $1,500 and Pemberton was paid a fee of $35,000.

At the time of the closing, the accountant for the purchasers told Omni, et al that Turner would incur substantial state income taxes on the sale. Omni, et al did not mention this to Pemberton.

Although the option agreement stated the purchase price, Wales was not told how the price would be allocated between assets located in the states of Louisiana and South Carolina until January, 1977, after the closing. Without this information, Turner's state capital gains income taxes could not be calculated.

In January, 1977, Wales was contacted by Charles Turner regarding a final distribution of the sales proceeds to Turner shareholders. Wales told Charles Turner that there would be approximately $500,000 in state taxes due by Turner. Turner was surprised that state taxes were due and asked Wales to call Pemberton. Unable to reach Pemberton, Wales spoke with Barton about the state taxes. Barton told Wales that he was surprised that state taxes were due and that he thought Pemberton was handling the tax aspects of the transaction.

As a result of the sale of its assets to Omni, et al, Turner incurred state income tax liability in the following amount:

| | | |
|---|---|---|
| 1. | Turner paid $381,157.00 to the State of Louisiana; however, $3,418.50 of this amount represented franchise taxes not attributable to Turner's income. | $377,739.12 |
| 2. | Turner paid $115,340.12 to South Carolina, however, $120.00 was a license fee which is not attributable to Turner's income. | 115,220.12 |
| 3. | Turner paid $1,422.26 to the State of Mississippi; however, $155.00 was a franchise tax not attributable to Turner's | |

| | |
|---|---|
| income. | $ 1,267.26 |
| TOTAL | $494,226.50 |

No amounts were accrued at the closing under § 4(c) to cover payment of these taxes. The taxes referred to became due and payable March 15, 1977.

As a result of the state taxes paid, Turner had a loss for federal tax purposes. The Hawthorn firm filed a refund claim for Turner and, as a direct result of the state taxes paid on the sales of its assets, Turner received a refund of federal taxes in the following amount:

| | |
|---|---|
| Calendar year 1973 | $20,524.90 |
| Calendar year 1975 | 28,152.55 |
| TOTAL | $48,677.45 |

## CONCLUSIONS OF LAW

This court has jurisdiction under 28 U.S.C. § 1332, diversity of citizenship. Turner was a Delaware corporation whose principal place of business was in Lemoyen, Louisiana. However, Richard Gantt, as trustee under a liquidating trust agreement, brings this suit and is a citizen of South Carolina. Defendant Wales and his partnership are citizens of Louisiana. The remaining defendants, Omni, et al, are all citizens of states other than South Carolina.

The court, through the U.S. Magistrate, on its own motion and later on motion of the defendants, questioned subject matter jurisdiction in this action, specifically questioning whether Richard A. Gantt, as trustee, was the real party in interest, as opposed to the prior shareholders and beneficiaries of the Turner trust, some of whom are citizens of Louisiana. The defendants alleged that the trustee had been "improperly or collusively" appointed as trustee in order to create or manufacture diversity of citizenship. Judge Boyle of the Eastern District, to whom this case was then assigned, held that he could not conclude that the appointment was made solely for the purpose of creating diversity jurisdiction as Mr. Turner and his family were also residents of South Carolina, and Gantt himself, "while not closely connected with the sale of the properties, was not a stran-

ger to it, having been retained to write title insurance in connection with the transaction." Judge Boyle's ruling was reaffirmed by order of May 14, 1980 after the case had been reassigned to this District, and was again reaffirmed at trial on the merits. Judge Boyle's decision is the "law of the case" and will not be disturbed, particularly because counsel has produced no new or different law or facts from those previously adduced; *Doe v. Marshall,* 694 F.2d 1038 (5th Cir.1983); *Goodpasture, Inc. v. M/V Pollux,* 688 F.2d 1003, reh. denied 693 F.2d 133 (5th Cir.1982); *Morrow v. Dillard,* 580 F.2d 1284 (5th Cir.1978) vacated on other grounds 642 F.2d 823 (5th Cir.1981). Since jurisdiction is based on diversity, Louisiana law applies. *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

I.

## LIABILITY OF OMNI, ET AL

Omni Lumber Company, as assignor, and Richard H. Friedberg, W.A. Moncrief, and W.A. Moncrief, Jr., as assignees of the option agreement and as purchasers, are alleged to be liable under the terms of the option agreement, specifically § 4(c).

"In addition, there shall be accrued at closing an amount of money necessary to defray all income taxes (state and federal) on income earned by Company for the calendar year 1976; an amount to defray 1976 real estate taxes; and an amount to defray accounts payable. Such amounts shall be retained by the Company out of its cash funds, if such funds are sufficient. If such funds are insufficient, Omni agrees to supply such cash deficiencies to pay for such accruals at closing. No other accruals shall be made."

Although Omni assigned its rights under the option to Friedberg, Moncrief and Moncrief, Jr., the assignment did not discharge Omni from its obligations under the option agreement. LSA–C.C. art. 2192; *Bonacorso v. Turnley,* 98 So.2d 295 (La.App. 1st Cir.1957).

Plaintiff interprets § 4(c) to mean that Omni must pay all income taxes whether imposed on income from operations or from capital gains and that Omni is liable to him for all state income taxes levied on Turner by Louisiana and South Carolina as a result of the sale. Omni interprets the agreement as meaning that Omni will pay the difference in the accrued amount and the actual amount owing for taxes on "income earned" by the company, which excludes capital gains taxes claimed by the plaintiff in this action. The controversy involves the meaning of "all income taxes (state and federal) on income earned by the Company. . . ." § 4(c).

Since this is a diversity action, the court must look to the law of Louisiana and there are several articles of the Louisiana Civil Code relating to interpretation of contracts which have application to this matter. Article 1945 notes that courts are bound to give legal effect to contracts "according the true intent of all the parties" and further provides that the intent is to be determined "by the words of the contract, when these are clear and explicit and lead to no absurd consequences."

Article 1946 notes that the words of the contract are to be understood "in the common and usual signification, without attending so much to grammatical rules, as to general and popular use." Article 1947 points out, however:

"Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong."

Article 1948 notes that where there is doubt as to the sense of the words "they may be explained by referring to other words or phrases used in making the same contract." Article 1955 provides that all clauses are to be interpreted "the one by the other, giving to each the sense that results from the entire act," while Article 1956 provides that where the intent is doubtful, the manner in which the contract has been executed furnishes a rule for its interpretation. Article 1958 provides:

"But if the doubt or obscurity arise for the want of necessary explanation which one of the parties ought to have given, or from any negligence or fault of his, the construction most favorable to the other party shall be adopted, whether he be obligor or obligee."

Turning to the contract before the court, both sides agree that paragraph 4(c) is vague and ambiguous or, in the words of the Civil Code "doubtful," particularly as regards the meaning of the phrase "income taxes (state and federal) on income earned by the company." The court concurs.

■ While the provision is certainly vague as to the meaning of "income earned," in this court's opinion, the paragraph is completely clear and explicit as to the obligations of Omni regarding the accruals referred to in the contract. The contract requires that a sum sufficient to defray real estate taxes and all income taxes on "income earned" shall be accrued at closing, using Turner's cash. In the event that the cash is not sufficient to cover the amount accrued to pay income taxes, then Omni, *at the closing,* must supply sufficient funds to cover the amount accrued to pay taxes. Without regard to the type or amount of "income earned" and the taxes levied thereon, Omni's only obligation is to be performed *at the closing.* After the closing, Omni has no further obligation of any kind under paragraph 4(c). By the terms of that paragraph it clearly agreed to cover whatever amount of Turner's taxes, estimated and accrued by Turner, that Turner did not have cash on hand to cover. But Omni agreed to cover only that amount accrued by Turner at the closing. It is undisputed that Turner's cash was sufficient to cover the amount accrued by Turner, at the closing, for payment of its taxes. Thus Omni was not called upon to "supply such cash deficiencies" and its obligations under paragraph 4(c) expired with the closing.

The words of the contract on this point are clear and explicit and "lead to no absurd consequences," and under Article 1945 the court is bound to give it legal effect.

■ Although we have concluded that Omni incurred no post-closing responsibility for accruals, we also consider the doubtful term "income earned." The Omni defendants urge that the court look to various sections of the Federal Internal Revenue Code which utilize and define the term "earned income" (particularly 26 U.S.C. §§ 34, 43, 401(c), 911 and 1348, now repealed). Since the paragraph in question relates to payment of taxes, it would certainly be logical, under Article 1947 of the Civil Code, to refer to accepted technical phrases in the tax field or profession. The problem, however, with that approach is that the term "income earned" is not found anywhere in the Internal Revenue Code and it can not be accepted as a term of art or technical phrase. The Omni defendants point out that "earned income" is consistently defined as including only compensation for services as opposed to a return on capital invested. Although there are nuances among the various sections of the Internal Revenue Code where this phrase is employed, the basic distinction between a return on capital and payment for personal services is maintained throughout. Plaintiff's approach is to read paragraph 4(c) as providing that a sum sufficient to pay all income taxes "on income of the company" shall be accrued. Plaintiff would thus ignore the word "earned" and defendants would reverse the order of the words.

Both sides have offered extrinsic evidence in an attempt to explain the doubtful phrase. Plaintiff points to the desire expressed by Turner's officers and directors to net not less than $11,750,000.00 after all costs, including taxes are paid. Plaintiff also cites the testimony of Pemberton, who drafted the provision, that his intent was to impose all liability for state capital gain taxes upon Omni. The Omni defendants, on the other hand, point to prior drafts of the same provision and the testimony of Mr. Wray, who represented Omni in the negotiations and drafting of the option agreement, to the effect that he did not intend paragraph 4(c) to relate to any taxes except those arising from the operation of the com-

pany operations of the company. The evidence shows that the income from operations for 1976 amounted to about $176,000.00.

The reliability of Pemberton's testimony regarding the meaning of paragraph 4(c) is drawn into question by the undisputed fact that when the certified public accountant, Wales, asked him what that provision meant, Pemberton told Wales to estimate all income from operations for 1976 and to calculate state and federal taxes thereon. At this point in time, before the closing, Pemberton made no mention of state capital gains taxes. This fact is significant because it constitutes an interpretation or execution of the provision by the author. La.C.C. art. 1956. The doubt or obscurity in this agreement arises for want of necessary explanation by Pemberton. Under these circumstances Article 1958 mandates the construction most favorable to the Omni group. Since Pemberton, the author, now claims that he intended for this provision to cover taxes arising from the capital gain made by Turner on the sale to Omni, it was his obligation to explain that intent to the other party.

The court, therefore, adopts the construction of paragraph 4(c) most favorable to the Omni defendants and holds that the term "all income taxes (state and federal) on income earned by Company for the calendar year 1976" refers only to income generated by the corporation from its operations and that it does not include taxes on the capital gain arising from the sale.

For these reasons, plaintiff has failed to establish the liability of the Omni defendants.

## II.

## LIABILITY OF THE CERTIFIED PUBLIC ACCOUNTANTS

■ Plaintiff alleges that Wales and his partnership failed to determine and inform the client, Turner, about tax liability on the transaction and failed to accrue the taxes. This latter claim is without merit since the court has determined that § 4(c) does not include state taxes on the sale. Wales had no duty to accrue these taxes since they were not part of § 4(c); moreover, he was specifically instructed by Pemberton to accrue only income from operations and he was not provided the allocation of the sales price between Louisiana assets and South Carolina assets—information essential to determine the amount of state capital gains taxes.

■ Under Louisiana law all professionals are held to the same standard of care regarding performance of services for their clients. In *Calandro Development, Inc. v. R.M. Butler Contractors, Inc.,* 249 So.2d 254 (La.App. 1st Cir.1971), a case involving an engineer, the court stated:

"... Our jurisprudence uniformly holds that the duty owed by those practicing learned professions to their clients, patients or retainers, is that of exercising that degree of professional care and skill customarily employed by others of the same profession in the same general area..." (249 So.2d at 265).

■ While we have found no Louisiana case so holding, both plaintiff and the defendant certified public accountant firm concede that the state courts would consider that certified public accountants are professionals and thus bound to a professional standard. At least one federal district court has so held. *Bancroft v. Indemnity Insurance Company of North America,* 203 F.Supp. 49 (W.D.La.1962); aff'd 309 F.2d 959 (5th Cir.1962). Accordingly, the accountant defendants will be held to the same standard that Louisiana applies to lawyers, physicians, engineers and other professionals. The Supreme Court of Louisiana set forth the applicable standard in *Ramp v. St. Paul Fire & Marine Insurance Company,* 263 La. 774, 269 So.2d 239 (1972), as follows:

"An attorney is obligated to exercise at least that degree of care, skill, and diligence which is exercised by prudent practicing attorneys in his locality. He is not required to exercise perfect judgment in every instance. However, the attorney's license to practice and his contract for

employment hold out to the client that he possesses certain minimal skills, knowledge and abilities..." (269 So.2d at 244).

Thus, Wales and the accountant firm by virtue of their certification by the state and their engagement to perform services on behalf of Turner represent that they possess certain minimum skills, knowledge and abilities and they will be held to the standard of prudent practicing accountants in the locality. See, e.g., *Gill v. DiFatta,* 364 So.2d 1352 (La.App. 4th Cir.1978); *Corceller v. Brooks,* 347 So.2d 274 (4th Cir.1977), writ den. 350 So.2d 1223 (La.1977); *Thomas v. Adams,* 271 So.2d 684 (La.App. 1st Cir. 1972).

■ The cases indicate that Louisiana follows the "locality rule," that is to say, professionals must exercise that degree of care and skill customarily employed by others of the same profession in the area where they practice. We have found no specific definition of "locality" but conclude that it must be employed in a reasonably flexible manner to define the general geographic area of practice, without attention to the niceties of municipal or parish boundary lines but yet restricting the term to an area less than state wide. No evidence was offered by either side as to the degree of care and skill customarily employed in the Baton Rouge metropolitan area by certified public accountants. Plaintiff did qualify an expert certified public accountant, Mr. Pinner, (who also has a law degree). Mr. Pinner practices or has practiced not only in New Orleans, but the Baton Rouge, Houma and Donaldsonville areas. The witness testified that had he been Wales he would have done a number of things differently but he never ventured an opinion that the average prudent certified public accountant in the Baton Rouge area would be expected to handle the matter in accordance with his suggestions, rather than as Wales actually handled it.

■ Plaintiff insists that the accountants deviated from the standard demanded of them because Wales, knowing that both Louisiana and South Carolina would impose capital gains taxes on Turner as a result of the sale of the assets, failed to call this to the attention of the attorney Pemberton, or any other representative of Turner.

Turner was essentially a dormant enterprise for a number of years before the sale; its operations were very limited and its income consisted chiefly of that generated by its considerable assets, including, for example, ownership of some 20,000 acres of land in Louisiana. Mr. George Barker, vice president of Turner, who lived in Louisiana, was the only contact that Wales had with the company. Wales was first employed in 1974 to perform a full audit and he prepared the federal, Louisiana and South Carolina income tax returns for the years 1974 and 1975. In December 1976, he fully expected to prepare the tax returns for 1976.

Wales was first notified of the impending sale on December 3, 1976 after the negotiations were complete and the contract documents executed. He had no prior knowledge that negotiations were under way, or the nature of the agreement, or of the professed desire of Turner officers and directors to net $11,750,000 from the sale after taxes and all other expenses. In fact he was never informed of the "net price" feature of the transaction at all. It was not until the December 10, 1976 meeting with Pemberton that Wales obtained a copy of the agreement, and although taxes on the sale occurred to him, Pemberton told him not to worry about them, that he, Pemberton, was handling the sale. Wales was only to accrue taxes from operations. Following this initial meeting, Wales attended two meetings concerning the sale and at no time was he asked about the possibility of state tax liability from the sale of Turner assets. Wales was not informed as to how the price would be allocated between the assets located in Louisiana and South Carolina until after the closing. Without this information, Turner's state income taxes could not be calculated. Plaintiff's accounting expert testified that the fee of $1,500 received by Wales indicates a very limited engagement in the overall transaction.

After his meeting with Pemberton, Wales contacted Barker by telephone and was told that Pemberton was the company's general counsel, that he was handling the sale and that he (Wales) should do whatever Pemberton requested him to do. Pemberton testified that he has an extensive background in taxation, including an undergraduate degree in accounting, experience in serving with the Internal Revenue Service, and specialization in the practice of tax law. He revealed his extensive background to Wales at their meeting and he made it plain to Wales that he, the attorney, was handling the transaction.

The court concludes that Wales was engaged to perform primarily the accounting function of computing the company's net income from operations and estimating the income taxes upon that net income. No tax advice was sought from Wales. While accountants are frequently called upon to give tax advice, which creates a certain degree of tension between them and members of the legal profession, *Bancroft v. Indemnity Insurance Co. of North America*, 203 F.Supp. 49 (W.D.La.1962), this court can not accept the view of the expert, Mr. Pinner, who would have had Mr. Wales essentially duplicate the efforts of the attorney Mr. Pemberton. Pemberton told Wales that he specialized in tax law and he testified at the trial that, "I do not hire certified public accountants to tell me what the tax law is."

Plaintiff's expert, armed with the benefit of hindsight and all of the information that was not made available to Wales, would nevertheless have had Wales demand a copy of the option agreement prior to the time that Pemberton gave him one, demand that the attorney give him a step by step "run through" of the entire transaction and closing, demand a copy of the plan of liquidation and federal form 966, require the attorney to state in writing precisely what the accountant's responsibilities were, require an engagement letter from Turner setting forth the exact responsibilities of the accountant, inform "the client" (not identified as to whether Pemberton, Barker, or some other representative of Turner) that there would be state income taxes imposed upon the sale, and finally, express concern (the witness did not say to whom) that Turner had no Louisiana lawyer representing it.

This witness's opinion is simply not predicated in reality and the court concludes that Mr. Pinner is an extraordinarily cautious accountant. Wales had no reason to increase the expense to his client by duplicating Pemberton's efforts and it would have been presumptuous of him to tell Turner that it needed an additional lawyer. Had Wales done all those things that Mr. Pinner said he ought to have done (assuming that he actually could have accomplished them) it is possible that Pemberton or some other representative of Turner would have discovered before the closing that state taxes would be imposed. It is more likely that he would have been discharged.

The case against Wales does not involve all of the elaborate steps outlined by plaintiff's expert; the case comes down to the fact that Wales knew state taxes would be due on the sale but failed to inform Turner. Surely, had Wales known that Turner was under the impression that no state tax would be due, he would have been professionally derelict in failing to call this fact to the attention of his client, despite the fact that the client did not ask for his opinion regarding possible state tax liability. The fact of the matter, however, is that Wales had no information which should have reasonably indicated to him that Turner did not anticipate state tax liability on the sale. While a certified public accountant should be, and is, held to minimum professional competence, I know of no rule, standard or circumstance that requires him to be clairvoyant. Wales here did what was requested of him; had he been perfect, he may have done more. The law does not demand perfection. *Ramp v. St. Paul Fire & Marine Ins. Co.*, 263 La. 774, 269 So.2d 239 (1972).

■ Moreover, even if Wales had had a duty to advise Turner of state tax liability, failure to perform that duty would not have been a cause in fact of Turner's damage. The proper method of determining whether

a party's omission to perform an act imposed by a duty is a cause in fact of damage to another is to determine whether performance of that act would have prevented the damage. *Gill v. DiFatta,* 364 So.2d 1352 (La.App. 4th Cir.1978).

By the time Wales was informed of the sale and obtained a copy of the agreement, all negotiations were complete, the contract documents executed and the option exercised. Under Louisiana law an option to purchase immovable property requires for its validity, reciprocal consent of both parties as to the thing, the price, and the terms; evidenced by a written instrument. LSA–C.C. art. 2462, *Greenleaf Plantation, Inc. v. Kieffer,* 403 So.2d 100 (La.App. 3rd Cir.1981).

After a review of the record, we are satisfied that these requirements were met. When the option is accepted within the time stipulated, the contract or agreement to sell may be specifically enforced by either party. LSA–C.C. art. 2462. Although the right to specific performance is not absolute, it will generally be enforced in those instances in which the promisor is legally able to comply with his engagement. *Fontenot v. Manuel,* 281 So.2d 156 (La.App. 3rd Cir.1973); *Thompson v. Thompson,* 211 La. 468, 30 So.2d 321 (1947).

While plaintiff asserts and Pemberton testified that had Wales informed him of the impending state taxes, he would have re-cast the sale so as to avoid them, the evidence convinces the court that the transaction was so far gone by that time that no other reasonable alternative was available to Turner but to conclude the closing. Omni's attorney testified that the Omni group would have refused any attempt to assess the state taxes upon them, that they would not have agreed to re-structure the agreement and that they would have insisted upon specific performance, if necessary, by litigation. If Omni agreed, Turner could have attempted to re-structure the transaction as a sale of all shares of Turner stock. This would have been risky, not only because the evidence indicates that some Turner shareholders were opposed to selling, but also because there was a very real chance that this move, although avoiding *state* taxes at the corporate level, would trigger *federal* taxes at the corporate level, thus negating the very purpose of the Section 337 proceedings, *Commissioner of I.R.S. v. Court Holding Co.,* 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); c.f., *Hines v. United States,* 477 F.2d 1063 (5th Cir.1973), and the federal taxes very likely would have been higher. Turner's alternatives to closing the sale by the time Wales was brought in, were to re-structure the agreement, if the Omni group agreed, or to engage in costly litigation with them, if they did not agree—clearly a Hobson's choice. The evidence convinces the court that even had Wales personally informed Pemberton and each member of Turner's board of directors that Louisiana and South Carolina would impose taxes upon the sale, Turner would still have closed the sale and paid the taxes, because plaintiff has not proved that any reasonable alternative was open. Thus, no act or failure to act by Wales was the cause in fact (proximate cause) of Turner's loss.

## III.

## LIABILITY UNDER THE CROSS AND COUNTER–CLAIMS

Pemberton and his partnership filed a cross-claim against Omni, Friedberg, Moncrief and Moncrief, Jr. for indemnity in the event Pemberton was found liable. Pemberton bases this claim on the theory of contract and unjust enrichment. Omni asserts a counter-claim against plaintiff, relating to recovery of attorney fees from Pemberton. Both of these claims have been rendered moot by plaintiff's settlement with defendant, Pemberton and his partnership and the court's finding of non-liability of the Omni defendants.

For the foregoing reasons judgment will be entered in favor of defendants, dismissing plaintiff's action.